NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                          :
SIERRA CLUB, NEW JERSEY PUBLIC            :
INTEREST GROUP CITIZENS                   :
LOBBY, INC., and NEW JERSEY               :
ENVIRONMENTAL FEDERATION,                 :          Civil Action No. 05-1724 (JAP)
                                          :
           Plaintiffs,                    :
                                          :          OPINION
      v.                                  :
                                          :
UNITED STATES ARMY CORPS                  :
OF ENGINEERS, COLONEL RICHARD             :
J. POLO, JR., and MEADOWLAND              :
MILLS/MACK-CALI LIMITED                   :
PARTNERSHIP,                              :
                                          :
           Defendants.                    :
_____:

APPEARANCES:

Edward Lloyd (EL 2633)
Reed Super (Admitted *Pro Hac Vice*)
MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.
Environmental Law Clinic
Columbia University School of Law
Box E-17
435 West 116th Street
New York, NY  10027
(212) 854-4376/4291

      *Attorneys for Plaintiffs*

Michael R. Cole (MRC 9388)
Benjamin Clarke (BC 3302)
DE COTIIS, FITZPATRICK, COLE & WISLER, LLP

Glenpointe Centre West
500 Frank W. Burr Blvd.
Teaneck, NJ  07666
(201) 928-1100

Virginia S. Albrecht
Eric J. Murdock
David C. Lashway
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, DC  20006
(202) 995-1500
(Admitted *Pro Hac Vice*)

*Attorneys for Defendant Meadowlands Mills/Mack-Cali Limited Partnership*


Kelly A. Johnson
Acting Assistant Attorney General
Environment and Natural Resources Division
Eileen T. McDonough (EM-0717)
Environmental Defense Section
UNITED STATES DEPARTMENT OF JUSTICE
Post Office Box 23986
Washington, D.C.  20026-3986
(202) 514-3126

Christopher J. Christie
UNITED STATES ATTORNEY
Susan Handler-Menahem (SHM 7714)
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ  07102
(973) 645-2843

*Attorneys for Defendants United States Army Corps of Engineers and
Colonel Richard J. Polo, Jr.*

PISANO, District Judge.

## I.   INTRODUCTION

Sierra Club, New Jersey Public Interest Group Citizen Lobby, Inc., and New Jersey Environmental Federation (collectively, "Plaintiffs") brought this action against the United States Army Corps of Engineers and Colonel Richard J. Polo, Jr. (collectively, the "Army Corps") as well as the Meadowlands Mills/Mack-Cali Limited Partnership ("Mills/Mack-Cali"). Plaintiffs challenge a permit issued by the Army Corps pursuant to section 404 of the Clean Water Act, 33 U.S.C. § 1344 ("CWA"), and section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, authorizing Mills/Mack-Cali to fill 7.69 acres of wetlands in East Rutherford, New Jersey that are subject to the jurisdiction of the Army Corps (the "7.69 acres of wetlands" or the "Cedar Creek Wetlands"). Mills/Mack-Cali sought permission to fill the 7.69 acres of wetlands in connection with the construction of a project, named the Meadowlands Xanadu Redevelopment Project ("Xanadu"), at the Continental Airlines Arena site within the Meadowlands Sports Complex in East Rutherford, New Jersey. The Meadowlands Sports Complex, including the site for which Xanadu is planned, is owned and managed by the New Jersey Sports and Exposition Authority ("NJSEA"), a corporate agency of the State of New Jersey. Plaintiffs have moved for a preliminary injunction ordering Mills/Mack-Cali to cease any further filling of the Cedar Creek Wetlands and prohibiting Mills/Mack-Cali from any further construction work in or upon these wetlands and open waters. Because Plaintiffs have failed to establish that they are entitled to preliminary injunctive relief, Plaintiffs' motion for a preliminary injunction must be denied.

## II. HISTORY

### A. The Meadowlands

The New Jersey Meadowlands consist of approximately 20,000 acres in New Jersey's Hudson and Bergen counties.  Army Corps' Memorandum for Record ("MR") at 8 (March 18, 2005) (Certification of Edward Lloyd ("Lloyd Cert.") Ex. 1).  Open space, wetlands, and waterways comprise approximately 8,530 acres of the Meadowlands.  *Id.*  According to Meadowlands Commission internet resources, the Meadowlands "is now home to more than 265 different species of birds and is recognized as a major migratory fly-over and resting preserve[; and s]hellfish and finfish have returned in abundance."  New Jersey Meadowlands Commission website, available at http://www.meadowlands.state.nj.us/commission/index/cfm (last visited Apr. 17, 2005) (Lloyd Cert., Ex. 19).

### B. The NJSEA

The NJSEA is a corporate agency of the State of New Jersey that was established in 1971 by the legislature of the State of New Jersey.  *See* New Jersey Sports and Exposition Authority Law, N.J.S.A. 5:10-1 et. seq.  The New Jersey Sports and Exposition Authority Law declares:

> The Legislature hereby finds and declares that the general welfare, health and prosperity of the people of the State will be promoted by the holding of athletic contests, horse racing and other spectator sporting events and of trade shows and other expositions in the State; that in order to induce professional athletic teams, particularly major league football and baseball teams, to locate their franchises in the State, it is necessary to provide stadiums and related facilities for the use of such teams, in addition to the facilities for horse racing and other spectator sporting events and to undertake the projects herein described; that such projects would provide needed recreation, forums and expositions for the public. . . .
>
> . . . The Legislature has determined that to provide for the projects, including the establishment and operation of the needed stadiums and other facilities for the holding of such spectator sports, expositions and other public events and uses, a

corporate agency of the State shall be created with the necessary powers to accomplish these purposes.

The Legislature further finds that the authority and powers conferred under this act and the expenditure of public moneys pursuant thereto constitute a serving of a valid public purpose and that the enactment of the provisions hereinafter set forth is in the public interest and is hereby so declared to be such as a matter of express legislative determination.

N.J.S.A. 5:10-2.  The NJSEA is empowered in relevant part to:

determine the location, type and character of a project or any part thereof and all other matters in connection with all or any part of a project, notwithstanding any land use plan, zoning regulation, building code or similar regulation heretofore or hereafter adopted by the State, any municipality, county, public body politic and corporate, including but not limited to the Meadowlands Commission, or any other political subdivision of the State, except . . . that the authority shall consult with the Meadowlands Commission before making any determination as to the location, type and character of any project under the jurisdiction of the Meadowlands Commission.

N.J.S.A. 5:10-5(x).  NJSEA must "consult with the Meadowlands Commission and the Department of Environmental Protection with respect to the ecological factors constituting the environment of the Hackensack meadowlands to the end that the delicate environmental balance of the Hackensack meadowlands may be maintained and preserved."  N.J.S.A. 5:10-23.

### C.  The Sports Complex

The NJSEA's Sports Complex in East Rutherford, New Jersey, comprises 684 acres of the New Jersey Meadowlands.  MR at 5 (Lloyd Cert. Ex. 1).  The Sports Complex is presently home to the Continental Airlines Arena, Giants Stadium, the Meadowlands Racetrack, ancillary buildings, and parking facilities.  *Id*.  The Continental Airlines Arena site at issue in this litigation occupies 104 acres of the 684-acre Sports Complex; the Continental Airlines Arena itself occupies 11 acres.  *Id*.

### D.  The Redevelopment Plan for the Continental Airlines Arena Site

In June 2002, the NJSEA issued a Request for Proposals ("RFP") soliciting plans from private companies to redevelop the 104-acre Continental Airlines Arena site.  RFP (Lloyd Cert. Ex. 2).  The RFP defined the objectives for the redevelopment project:

> [NJSEA] envisions creating a multi-use destination at the Arena site that capitalizes on existing uses at the Meadowlands and expands the product mix in a manner that is complementary to those uses, without materially competing with existing business in the Meadowlands District.  It is [NJSEA]'s desire to select a Master Developer to organize a cohesive plan for the Arena Site that will connect to and integrate new development with the remainder of the Complex and existing facilities, particularly through uses that complement the Meadowlands Racetrack and are compatible with the operation of Giants Stadium.

> [NJSEA] is receptive to some or all of the following uses on the Arena site: dining, entertainment, retail, hotel, office, exposition facilities, recreation, parking and transportation centers, but will look to the development community and the marketplace to propose innovative uses that maximize the potential of the Arena site, best achieve the strategic goals of [NJSEA], are consistent with [NJSEA's] public purpose as set forth in its enabling legislation, and promote smart growth and sound economic development in the region.

RFP at § A1 (Lloyd Cert. Ex. 2).  The RFP also indicated that the NJSEA "is receptive to concepts that incorporate reuse of the Arena."  *Id*.  Potential bidders were informed that a "small wetland occupies approximately eight (8) acres of the Arena site."  *Id.* at § B2A.

During the bid selection process, representatives for public interest groups, including Plaintiffs, submitted letters to the NJSEA and representatives of the bidders requesting that proposals that avoided filling the Cedar Creek Wetlands be submitted.  On October 18, 2002, a letter was sent to the President and CEO of NJSEA urging the NJSEA to "award greater credit to those proposals that avoid any wetlands fill at the redevelopment site itself."  Letter to George Zoffinger at 2 (Oct. 18, 2002) (Lloyd Cert. Ex. 21).  On October 25, 2002, counsel for Plaintiffs

6

sent a copy of the aforementioned October 18, 2002 letter to representatives for bidders participating in NJSEA's RFP process, including Mill/Mack-Cali.  Letter to Robert DeCotiis (Oct. 25, 2002) (Lloyd Cert. Ex. 22).

The bid selection process was comprised of multiple steps.  The process entailed review of initial submissions by an NJSEA committee and a group that included two local mayors, two local legislators, and representatives from the Meadowlands Chamber of Commere, New Jersey Transit, environmental groups, and local trade unions.  Public briefings for local officials were conducted and public comments were solicited.  Three developers were asked to submit Best and Final Offers.  Final Environmental Impact Statement § 2.3 (Cole Cert. Ex. 1).  In February 2003, the NJSEA selected the proposal made by Mills/Mack-Cali.  *Id.* at  § 3.2.3.4.

In December 2003, the NJSEA and Mills/Mack-Cali entered into a Redevelopment Agreement, which was amended in October 2004.  Redevelopment Agreement (Lloyd Cert. Ex. 3); *see also* Amended Redevelopment Agreement (Cole Cert. Ex. 2).  The Redevelopment Agreement delineates the uses for which Mills/Mack-Cali has the right to redevelop the Continental Airlines Arena site.  Redevelopment Agreement (Lloyd Cert. Ex. 3).  The Redevelopment Agreement provides that certain components of the project, including development of a hotel, office space, and minor league baseball stadium, are contingent upon "favorable economic and market conditions."  Redevelopment Agreement (Lloyd Cert. Ex. 3).  In addition, Mills/Mack-Cali entered into a ground lease with NJSEA for the Continental Airlines Arena site.  Master Ground Lease (Oct. 5, 2004) (Cole Cert. Ex. 3).  Xanadu is a proposed $1.3 billion, 4.96 million square foot shopping, sports, entertainment, hotel and office complex.  MR at 4 (Lloyd Cert. Ex.1).  Mills/Mack-Cali must pay NJSEA both for the development rights as

well as an agreed-upon ground rent.

Xanadu was subject to review under New Jersey law.  *See* N.J.S.A. 5:10-5(x).  NJSEA, the New Jersey Meadowlands Commission, the New Jersey Department of Environmental Protection, the New Jersey Department of Transportation, and the New Jersey Transportation Planning Agency each participated in some stage of a State Environmental Impact Statement review process, which included preparation of a Preliminary Draft Environmental Impact Statement ("PEIS"), circulation of the PEIS for public comment and subjecting the PEIS to public hearings, and review and submission of comments and modifications, approval by various agencies of the State of New Jersey, and ultimately the release of a Final Environmental Impact Statement ("FEIS") in August 2004.  In addition to the State Environmental Impact Statement review process, the New Jersey Department of Environmental Protection's Land Use Regulatory Program reviewed the potential environmental impacts of and received public comments on Xanadu.  At the culmination of this process, the New Jersey Department of Environmental Protection authorized the Xanadu project, including specifically the fillings of the 7.69 acres of wetlands.  State of New Jersey Department of Environmental Protection Permit (Oct. 4, 2004) (Charette Decl. Ex. 15).

### E.  Federal Permit to Fill the Cedar Creek Wetlands

#### *1.  The Proposed Fill Areas*

The Xanadu project requires filling of 7.69 acres of wetlands under the jurisdiction of the Army Corps.  The proposed fill area of 7.69 acres is comprised of ten distinct parcels:  five at the Xanadu site and five in adjacent areas where improvements to infrastructure are planned.  MR at 2 (Lloyd Cert. Ex. 1).  The largest contiguous parcel is a 5.33 acre area East of the Continental

Airlines Arena in the proposed footprint of the entertainment component of Xanadu.  Another

discrete parcel is a 1.52 acre strip along the Northern edge of the Continental Airlines Arena site.

The remaining 0.73 acres consist of several smaller patches.  Amended Permit Application (June

7, 2003) (Charette Decl. Ex. 3); Estimated Wetlands Impact Area Map (Charette Decl. Ex. 9).

The Army Corps described the areas to be filled as follows:

> The wetlands and waterways that would be filled are 1) fragmented from major
> wetlands in the region (i.e., surrounded by existing development and roadways); 2)
> exhibit contamination levels above the applicable NJDEP criteria; and 3) heavily
> disturbed by previous human activities.

MR at 7 (Lloyd Cert. Ex. 1).

### 2.  The Permit Application

In June 2003, Mill/Mack-Cali applied to the Army Corps for a permit to fill the 7.69 acres

of wetlands in connection with development of Xanadu.[1]  MR at 1 (Lloyd Cert. Ex. 1).

Representatives of Plaintiffs and other public interest organizations directed statements to

NJSEA, Mills/Mack-Cali, and the Commissioner of the New Jersey Department of

Environmental Protection arguing the Cedar Creek wetlands should be preserved.  (Lloyd Cert.

Exs. 26-27).

The Army Corps issued a jurisdictional determination on November 13, 2003, and,

following submissions of amended permit applications by Mills/Mack-Cali reflecting the Army

Corps' conclusions, issued an amended jurisdictional determination on July 27, 2004.  MR at 5-6

(Lloyd Cert. Ex. 1).  An amended permit application submitted by Mills/Mack-Cali in May 2004

included an alternatives analysis and a compensatory mitigation plan proposing preservation of

---

[1] Mills/Mack-Cali amended its application in May 2004.  MR at 1 (Lloyd Cert. Ex. 1)
("Amended Permit Application").

235 acres of wetlands on the 587-acre Empire Tract.  Revised Permit Application Exs. F, H at 3

(Charette Decl. Ex. 3).

The application was deemed complete on July 28, 2004.  MR at 10 (Lloyd Cert. Ex. 1).

### 3.   *The Public Hearing and Public Comments*

On July 27, 2004, the Army Corps issued a public notice that described the permit

application and announced the commencement of a public comment period on Mills/Mack-Cali's

application as well as a public hearing on August 26, 2004.  USACE, Public Notice No. 2003-

00549-RS (Jul 27, 2004) (Cole Cert. Ex. 17); MR at 10-11 (Lloyd Cert. Ex. 1).  At the August

26, 2004 public hearing held by the Army Corps, eight individuals testified, including

representatives of Plaintiffs and Mills/Mack-Cali.  USACE, *Transcript of Public Hearing* (Aug.

26, 2004) (Cole Cert. Ex. 9).  Public comments were received from three federal agencies and

from four members of the public, including Plaintiffs.  Letter from G. Nieves to M. Luchkiw

(Sept. 29, 204) (Cole Cert. Ex. 10).  Mills/Mack-Cali filed responses to comments on October

29, 2004.  Applicant's Response to Comments (October 29, 2004) (Charette Decl. Ex. 5).  One

of the ultimately unsuccessful finalist bidders submitted comments after the close of the

comment period, to which Mills/Mack-Cali submitted a response in December 2004.

Applicant's Response to Late Filed Comments (Dec. 29, 2004) (Charette Decl. Ex. 6).

On March 18, 2005, the Army Corps issued the permit authorizing the fill of the 7.69

acres of wetlands.  Permit No. 2003-00549 (March 18, 2005) (Lloyd Cert. Ex. 10).  In its

Memorandum for Record, the Army Corps discussed the public comments and Mills/Mack-

Cali's responses thereto.  Notably, many of the issues now raised by Plaintiffs were already

raised and addressed in the Memorandum for Record.  The Court has been informed that, at the

time of the hearing of this matter, 80% of the 7.69 acres had been filled pursuant to the permit.

Plaintiffs commenced this action on March 30, 2005.  On May 4, 2005, Plaintiffs moved by order to show cause for a preliminary injunction enjoining Mills/Mack-Cali from further filling of the 7.69 acres of wetlands and from preparation for construction or construction of structures over the 7.69 acres of wetlands.  The briefing on Plaintiffs' motion was completed on Jun 27, 2005.  On July 6, 2005, oral argument was held on Plaintiffs' motion.  The Court determined that Plaintiffs' had not established that they were entitled to preliminary injunctive relief and accordingly denied Plaintiffs' motion.  This written opinion supplements the verbal opinion given by the Court at the July 6, 2005 hearing.

## III.  DISCUSSION

### A.  Standard for Preliminary Injunctive Relief

In evaluating a request for a preliminary injunction, a court must consider whether: "'(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest.'"  *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (quoting *Maldonado v. Houstoun,* 157 F.3d 179, 184 (3d Cir.1998)).  A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Masurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Preliminary injunctive relief is an "extraordinary and drastic remedy", *id.*, which "should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief."  *American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994).

11

**B.  Plaintiffs Have Failed to Establish a Likelihood of Success on the Merits**

Plaintiffs' motion for preliminary injunctive relief challenges the Army Corps' determination that no practicable alternative exists to filling the 7.69 acres of wetlands.  Plaintiffs raise the following arguments in so challenging the Army Corps' decision:  that the Army Corps defined the project purpose in improperly narrow terms and practicable alternatives thereby were precluded; that the Army Corps failed to make a determination that Xanadu is not water-dependent and failed to apply the presumption that practicable alternatives exist for projects that are not-water dependent unless clearly demonstrated otherwise; and that the Army Corps did not properly consider alternatives that could avoid or minimize the filling of wetlands.  Plaintiffs' have failed to establish a likelihood of success on the merits.

### 1.  *Clean Water Act Fill Permit Framework*

The CWA establishes a regulatory regime designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To achieve this goal, the CWA prohibits discharge of any pollutant, including dredged or fill material, into navigable waters, which include certain wetlands,[2] unless authorized by a CWA permit issued by the Army Corps.  33 U.S.C. § 1311(a).

Section 404 of the CWA authorizes the Army Corps to "issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).  CWA regulations establish a case-by-case review process for the issuance of individual permits that involves site-specific

---

[2] "Navigable waters" are "waters of the United States," which includes certain wetlands as outlined in regulations promulgated under the CWA.  33 U.S.C. § 1362(7); 33 C.F.R. § 328.3; *see also* 40 C.F.R. 230.3.

documentation and review, opportunity for public hearing, public interest review, and a formal determination.  *See* 33 C.F.R. Pts. 323, 325.  The public interest review for an individual permit requires that the Army Corps balance "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments."  33 C.F.R. § 320.4(a)(1).  A permit will not be granted if contrary to the public interest.  *Id.*

A CWA section 404 permit must satisfy regulations promulgated both by the Army Corps and by the Environmental Protection Agency (the "EPA").  *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986).  The regulations promulgated by the EPA under section 404(b)(1) of the CWA (the "404(b)(1) Guidelines," codified at 40 C.F.R. Pt. 230)[3], provide that "[n]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."[4]  40 C.F.R. § 230.10(a); see also 33 C.F.R. § 320.4(a)(2)(ii) (indicating that the Army Corps' public interest analysis must take into account practicable alternative locations and methods for accomplishing the project's objective).  A "practicable" alternative is one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).  The 404(b)(1) Guidelines establish a presumption

---

[3] Regulations implementing the CWA promulgated by the Army Corps incorporate the 404(b)(1) Guidelines promulgated by the EPA, including by requiring the Army Corps' permitting decision to include an assessment of whether the activity conforms with the 404(b)(1) Guidelines.  *See* 33 C.F.R. § 320.4(b)(4); 33 C.F.R. § 325.2(a)(6).

[4] An "aquatic ecosystem" means "waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals."  40 C.F.R. § 230.3(c).

13

that all practicable alternatives that do not involve a discharge into wetlands have less adverse impact on the environment "unless clearly demonstrated otherwise." *Id.*; 40 C.F.R. §§ 230.2(q-1), 230.41.

To determine whether a practicable alternative exists, the Army Corps undertakes a multi-step sequential analysis. 40 C.F.R. § 230.5. In relevant part, the Army Corps first determines whether the project is water-dependent. *Id.*; 40 C.F.R. § 230.10(a)(3). The 404(b)(1) Guidelines establish a presumption that practicable alternatives are available for projects that are not water-dependent "unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). A water-dependent project is one that "requires access or proximity to or siting within the special aquatic site[, which includes wetlands,] in question to fulfill its basic purpose." 40 C.F.R. § 230.10(a)(3). If the Army Corps determines that the project is not water-dependent, it then must presume that practicable alternatives not involving wetlands exist. 40 C.F.R. §§ 230.10(a)(3), 230.5. A permit will not be granted unless the presumption is rebutted by a clear contrary demonstration by the applicant. 40 C.F.R. §§ 230.10(a)(3), 230.5.

The 404(b)(1) Guidelines also provide that, where no practicable alternative sites exist that would avoid filling or have a less adverse impact on wetlands, the next step in the analysis is to consider whether "appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d); *see also Fund for Animals, Inc.* v. Rice, 85 F.3d 535, 544 (11th Cir. 1996) (indicating that where "filling of wetlands cannot be avoided, the 'appropriate and practicable steps' must be taken to minimize the potential adverse impacts of the discharge on wetlands").

Finally, the Army Corps can reduce potential adverse impacts associated with a discharge

by requiring mitigation as a condition[5] of a permit.  33 C.F.R. § 325.4(a)(3); *see also* 33 C.F.R. § 210.4(r)(1).   Resource losses are to "be avoided to the extent practicable."  33 C.F.R. § 320.4(r)(1).  "Consideration of mitigation will occur throughout the permit application review process and includes avoiding, minimizing, rectifying, reducing, or compensating for resource losses."[6]  *Id.*  Mitigation to be accomplished through compensation "may occur on-site or at an off-site location."  *Id.*

### 2.  Standard of Review of Army Corps' Determination

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, provides that agency actions, findings, and conclusions can be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", 5 U.S.C. § 706(2)(A),(E), or "unsupported by substantial evidence."  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413-15 (1971).  This is a very narrow and highly deferential standard under which an agency's action is presumed valid.  *Id.* at 415; *Clean Ocean Action v. York*, 861 F. Supp. 1203, 1219 (D.N.J. 1994).

A reviewing "court is not empowered to substitute its judgment for the agency's." *Citizens to Preserve Overton Park*, 401 U.S. at 416.  Instead, the court's inquiry is limited to determining whether the agency "considered the relevant factors and articulated a rational

---

[5] The Army Corps "will add special conditions to Department of the Army permits when such conditions are necessary to satisfy legal requirements or to otherwise satisfy the public interest requirement."  33 C.F.R. § 325.4(a)(3).

[6] "Mitigation" may include "[a]voiding the impact altogether by not taking a certain action or parts of an action"; [r]ectifying the impact by repairing, rehabilitating, or restoring the affected environment"; and [c]ompensating for the impact by replacing or providing substitute resources or environments."  40 C.F.R. § 1508.20.

15

connection between the facts found and the choice made", *Baltimore Gas & Elec. Co. v. Natural Res. Defense Counsel, Inc*., 462 U.S. 87, 105 (1983), and "whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's conclusions will be upheld "if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Passaic Valley Sewerage Comm'ns v. U.S. Dept. of Labor*, 992 F.2d 474, 480 (3d Cir. 1993); *see also Hintz*, 800 F.2d at 831 ("The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action.").

Finally, substantial deference is given to an agency's interpretation of statutes it administers, and particularly to its own regulations, so long as the interpretation is a permissible one. *Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 844 (1984); *National Wildlife Federal v. Whistler*, 17 F.3d 1341, 1344 (8th Cir. 1994); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

### 3. The Army Corps' Definition of the Overall Project Purpose Was Neither Arbitrary and Capricious, Nor Contrary to Law

Plaintiffs argue that the definition of project purpose was overly narrow as a matter of law and not supported by the record. (Pltf.'s Br. at 44). Specifically, Plaintiffs allege that "[t]he first sentence of the Army Corps' project purpose definition is legally deficient because it is limited to the redevelopment of the Continental Arena Site and therefore precludes any consideration of offsite alternatives; [and] the second sentence is legally deficient because the [Army] Corps substitutes a project description for basic project purpose." (*Id.*).

Because the 404(b)(1) Guidelines define a "practicable alternative" as an alternative that "is available and capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes*", 40 C.F.R. § 230.10(a)(2) (emphasis added), the overall project purpose must be identified by the Army Corps as a predicate to the Army Corps' alternatives analysis.  *See Northwest Envt'l Defense Center v. Wood*, 947 F. Supp. 1371, 1377 (D. Ore. 1996).  The Army Corps is not restricted to the definition of project purpose contained in a permit application.  Rather, the Army Corps is "required independently to review and define the project's overall purpose," *Alameda Water & Sanitation Dist. v. Reilly,* 930 F.Supp. 486, 492 (D.Colo. 1996), and to ensure that the applicant's stated purpose is legitimate, *Friends of the Earth v. Hintz*, 800 F.2d 822, 833-34 (9th Cir. 1986).  However, the Army Corps "has a duty to take into account the objectives of the applicant's project.  Indeed, it would be bizarre if the [Army] Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable."  *Louisiana Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985); *see also Sylvester v. U.S. Army Corps of Engineers,* 882 F.2d 407, 409 (9th Cir. 1989) (same).  Nonetheless, "an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable."  *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989).

The Army Corps defined the Xanadu's overall project purpose as follows:

The overall project purpose is to redevelop the Continental Airlines Arena site (allowing for continued use of the Arena Building), as envisioned and authorized by the NJSEA and in conformance with the NJSEA's strategic planning objectives.  The overall project involves construction of a mixed-use commercial Entertainment/Recreation Center development emphasizing sports, recreation, and entertainment facilities, including a minor league baseball stadium, office buildings, a hotel, retail space, restaurants, required parking, and improvements to the

transportation network at and near the Meadowlands Sports Complex.

MR at 25 (Lloyd Cert. Ex. 1).  The Army Corps indicated that the definition of overall project purpose "is based on the RFP process and reflects, in general, the needs of the State of New Jersey as represented by the [NJSEA] and the Meadowlands Commission and as defined for implementation under the Redevelopment Agreement."  *Id.*

The definition's focus on the Continental Airlines Arena site is consistent with both case law and Army Corps guidance.  While Plaintiffs contend that the Army Corps' limitation of the project purpose to redevelopment of the Continental Airlines Arena site constitutes reversible error because it precludes consideration of off-site alternatives (Pltf.'s Br. at 44-45), courts have upheld location-specific overall project purpose definitions where the specific site was essential to the project purpose.  In *Sylvester v. U.S. Army Corps of Engineers*, a project purpose definition that restricted construction of golf course to the site of an alpine destination resort was upheld, even though it limited consideration of off-site alternatives not contiguous to the rest of the resort complex because they "'did not meet [the applicant] basic purpose and need.'"  *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989).  *Sylvester* stated that "in determining whether an alternative site is practicable, the [Army] Corps is not entitled to reject [the applicant]'s genuine and legitimate conclusion that the type of golf course it wishes to construct is economically advantageous to its resort development."  *Id.*  (quoting the administrative record).  Likewise, *Stewart v. Potts* found that "the City [of Lake Jackson]'s purpose of providing a local, affordable golf course would be thwarted if the golf course could not be constructed within the City's extraterritorial jurisdiction." *Stewart v. Potts*, 996 F. Supp. 668, 675-76 (S.D. Tex. 1998).  Accordingly, *Stewart* found that the Army Corps had discretion

18

"to consider alternatives only within the City of Lake Jackson's extraterritorial jurisdiction."  *Id.*
Similarly, *Northwest Environmental Defense Center v. Wood* determined that a project purpose
to "'develop a large semiconductor fabrication plant in the Eugene[, Oregon] area'" was neither
arbitrary nor capricious in light of "substantial evidence" in the administrative record regarding
the applicant's "legitimate economic reasons for choosing to construct its project in Eugene."
*Northwest Environmental Defense Center v. Wood*, 947 F. Supp. 1371, 1377 (D. Or. 1996)
(quoting administrative record).  In addition, Army Corps guidance further supports the
reasonableness of Army Corps' site-specific approach under circumstances where the site is
essential to the project's purpose:  "[s]ome projects may be so site-specific . . . that no offsite
alternative could be practicable.  In such cases the alternatives analysis may appropriately be
limited to onsite options only."  U.S. Army Corps of Engineers, *Regulatory Guidance Letter 93-
02:  Guidance on Flexibility of the 404(b)(1) Guidelines and Mitigation Banking*, § 3(a)(ii) (Aug.
23, 1993) (Cole Cert. Ex. 15).  The Army Corps' decision to restrict the project purpose to "the
Continental Airlines Arena site" is thus not contrary to law.

In addition, the site-specific project purpose definition is well-supported by the
administrative record.  As noted, the Army Corps may give deference to decisions of a state
agency regarding the purpose of a project sponsored by that entity.  *Hoosier Environmental
Council, Inc. v. U.S. Army Corps of Engineers*, 105 F. Supp. 2d 953 (S.D. Ind. 2000).  In the
Memorandum for Record, the Army Corps recognized that the NJSEA selected the site and the
redevelopment nature of the project, MR at 27 (Lloyd Cert. Ex. 1), and that "[b]y definition, the
only types of projects responsive to th[e NJSEA's] initiative were those that proposed to develop
new, related, and complementary uses on the [Continental Airlines] Arena site, not somewhere

19

else in northern New Jersey."  MR at 35 (Lloyd Cert. Ex. 1).  Moreover, the Army Corps noted

that each of the bidders' proposals to the NJSEA "affirmed that redevelopment of the Arena site

was an essential aspect of their respective project purposes."  *Id.* at 27.  As to Mills/Mack-Cali in

particular, the Army Corps considered that Mills/Mack-Cali, "as a bidder in this public process,

needed to propose a project to redevelop the [Continental Airlines] Arena site"; otherwise

Mills/Mack-Cali would have been disqualified as a bidder.  *Id.*  The record also reflects that both

the Fish and Wildlife Service and the Meadowlands Commission viewed the project purpose as

redevelopment of the Continental Arena Airlines site.  *Id.* at 19, 28.  Ultimately the Army Corps

concluded that "redevelopment is an entirely legitimate aspect of this project, which is well-

documented throughout the NJSEA's long planning and development history for this site and

which requires the introduction of 'new, related and complementary uses to the Arena site.'"  *Id.*

at 27.  Regardless, in responding to a challenge to the project purpose in the Memorandum for

Record, the Army Corps noted that the "stated overall project purpose has not precluded an

analysis of either off-sire aor onsite alternatives," and proceeded to explain that "[t]he applicant

has evaluated adjacent properties which might potentially allow opportunities for redevelopment

of the Arena site, but each of these sites was either too small to accommodate the overall project

elements or resulted in far greater impacts to wetlands."  *Id.* at 26.  Thus there is support in the

record for the Army Corps' approval of the site-specific project purpose and the Court cannot

conclude that it was arbitrary and capricious.

    The second sentence of the Xanadu project purpose definition is likewise proper.

Plaintiffs contend that the project purpose is "legally deficient" because it "substitutes a project

description for basic project purpose."  However, as noted above, the Army Corps has a duty to

consider the applicant's purpose.[7] *See, e.g., Sylvester*, 882 F.2d at 409; *Stewart*, 996 F. Supp. 675-76.  The Army Corps indicated that the overall project purpose was "to redevelop the Continental Airlines Arena site . . . *as envisioned and authorized by the NJSEA*."  MR at 25 (Lloyd Cert. Ex. 1) (emphasis added).  Accordingly, in defining the project purpose, the Army Corps relied on both the RFP and the Redevelopment Agreement.   MR at 25 (Lloyd Cert. Ex. 1). Furthermore, the Army Corps recognized that "[i]n selecting the applicant, NJSEA has approved each of the components set forth in the applicant's proposed project" and that "NJSEA has considered and endorsed the key elements of the overall project."  MR at 28 (Lloyd Cert. Ex. 1). Mills/Mack-Cali's objective necessarily must include what is authorized in the Redevelopment Agreement, and the Army Corps' deference to the determination of NJSEA regarding project components was not inappropriate.  *See Hoosier Environmental Council*, 105 F. Supp. 2d 953; *Sylvester*, 882 F.2d at 409.

Furthermore, the record indicates that the Army Corps properly took into account that the elements listed were essential elements of the project, specifically stating that the overall project purpose contained the "key project elements."  MR at 27-28 (Lloyd Cert. Ex. 1); *cf. Shoreline Assocs. v. March*, 555 F. Supp. 169, 179 (D.Md. 1983), *aff'd*, 725 F.2d 677 (4th Cir. 1984) (Army Corps must differentiate between project components that are integral to and merely incidental to a project's basic purpose).  In addition, the overall project purpose definition is in accordance with CWA regulations requiring "[a]ll activities which the applicant plans to undertake which are

---

[7] The Redevelopment Agreement embodies the final decision of the NJSEA as to the approved key components for the redevelopment of the site and, as such approval is a prerequisite to any development by Mills/Mack-Cali, also represents Mills/Mack-Cali's project purpose.

reasonably related to the same project and for which a DA permit would be required [to] be included in the same permit application." 33 C.F.R. § 325.1(d).[8]  In fact, in considering a comment made during the permitting process regarding the impacts of project component that are market-dependent and that are scheduled to be phased-in, the Army Corps recognized its obligation under 33 C.F.R. § 325.1(d) to consider the Applicant's plans to undertake activities reasonably related to the project.  MR at 56-57 (Lloyd Cert. Ex. 1).  Accordingly, the Army Corps' incorporation in the overall project purpose definition of the components of the project as identified and approved in the Redevelopment Agreement is neither contrary to law nor arbitrary and capricious.

        While a project's purpose may not be defined in an overly narrow manner so as to artificially constrain the Army Corps' alternatives analysis, *Whistler*, 17 F.3d at 1344, the definition of project purpose at issue does not raise these concerns.  In addition, under the circumstances present in this action, that the Army Corps included project components listed in the Redevelopment Agreement in the overall project purpose was not improper.  The Army Corps' conclusion that the "overall project purpose definition is reasonable, reflecting the needs of the State and this unique redevelopment property," is neither arbitrary and capricious, nor

--------

        [8] Section 325.1(d) states:

        All activities which the applicant plans to undertake which are reasonably related
        to the same project and for which a DA permit would be required should be
        included in the same permit application.  District engineers should reject, as
        incomplete, any permit application which fails to comply with this requirement.
        For example, a permit application for a marina will include dredging required for
        access as well as any fill associated with construction of the marina.

33 C.F.R. § 325.1(d).

contrary to law.  *See* 5 U.S.C. § 706(2)(a); *National Wildlife Federation v. Whistler*, 27 F.3d 1341, 1346 (8th Cir. 1994).

### 4.   *The Army Corps' Determination that No Practicable Alternatives Existed Was Neither Arbitrary and Capricious, Nor Contrary to Law*

Plaintiffs make three arguments regarding the alternatives analysis conducted by the Army Corps:  (1) the Army Corps failed to make a determination that the Xanadu project is not water-dependent and to apply the rebuttable presumption that practicable alternatives to filling wetlands exist as set forth in 40 C.F.R. § 230.10(a)(3) (Pltf.'s Br. at 35-41); (2) that the Army Corps failed to apply the proper practicability standard to evaluate alternatives as set forth in 40 C.F.R. § 230.10(a)(2) (Pltf.'s Br. at 52-61); and (3) the Army Corps failed to properly consider alternatives that would avoid or minimize the filling of wetlands (Pltf.'s Br. at 61-70).

### a.   *The Army Corps Properly Applied the Rebuttable Presumption Applicable to Non-Water-Dependent Projects*

As discussed above, wetlands may not be filled if a practicable alternative exists.  40 C.F.R. § 230.10(a).  In determining whether a practicable alternative exists, the Army Corps must first decide whether a project is water-dependent.  40 C.F.R. § 230.10(a)(3); *see also* 40 C.F.R. § 230.5.  If the Army Corps determines that the project is not water-dependent, it must presume that practicable alternatives with less environmental impact on wetlands are available.  40 C.F.R. § 230.10(a)(3).  This presumption can be rebutted if the applicant makes a clear demonstration to the contrary.  40 C.F.R. § 230.10(a)(3); *see also* 40 C.F.R. § 230.5.  Plaintiffs argue that the Army Corps failed to follow these sequencing requirements in that the Army Corps never made a determination that Xanadu is not water-dependent and thus failed to apply the presumption that upland alternatives exist.  (Pltf.'s Br. at 35-36).

Contrary to Plaintiffs' arguments, the Army Corps properly applied the presumption that practicable alternatives exist.  As an initial matter, that Xanadu is a non-water-dependent project has never been in question.  Plaintiffs even concede that "[t]he Xanadu project is clearly not water-dependent."  (Pltf.'s Br. at 35).  In addition, the Memorandum for Record reflects that the Army Corps applied the presumption of the availability of alternatives mandated for non-water-dependent projects.  MR at 29 (Lloyd Cert. Ex. 1).  In the Memorandum for Record, the Army Corps specifically referenced the "presumption of the availability of offsite alternatives" in responding to a public comment challenging whether Mills/Mack-Cali had sufficiently rebutted the presumption in connection with the off-site alternatives analysis.  MR at 29-36 (Lloyd Cert. Ex. 1) (concluding upon independent review that the Applicant had overcome the presumption).  Moreover, the Army Corps extensively analyzed both potential on-site and off-site alternatives.  MR at 29-57, 98-106 (Lloyd Cert. Ex. 1).  It can reasonably be discerned from the Army Corps' independent evaluation of the information in the record in analyzing potential on-site and off-site alternatives that the Army Corps properly applied the presumption.  *See Bowman Transp.*, 419 U.S. at 286 (stating that standard for agency review is met so long as the agency's decision-making path may "reasonably be discerned"); *Lodi Truck Serv., Inc.*, 706 F.2d at 901 (indicating that an agency is not required to furnish "detailed reasons for its decision" to satisfy arbitrary and capricious standard so long as the reviewing court is not required to "speculate" as to the basis of the decision).  In light of the foregoing, the Court concludes that the Army Corps properly applied the presumption that practicable alternatives exists.

### b.   The Army Corps' Analysis of Alternatives Was Proper and the Army Corps Reached a Rational Conclusion

As discussed above, the Army Corps was required to determine whether practicable alternatives[9] to the proposed filling activity existed.  Under the circumstances here, the Court must inquire whether the Army Corps' decision that Mills/Mack-Cali clearly demonstrated that no practicable alternatives existed was a clear error of judgment.  *See Alliance for Legal Action v. U.S. Army Corps of Engineers*, 314 F. Supp. 2d 534, 543 (M.D.N.C. 2004).  "If the record reveals that the agency examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made, the agency's decision is entitled to deference."  *Id.* (internal quotations and citations) (alterations in original) (referring to a decision by the Army Corps that an applicant had clearly demonstrated no practicable alternatives existed).  The scope of an alternatives analysis is in part a function of the seriousness of the potential for adverse environmental impacts.  *See* 40 C.F.R. 230.10 ("Although all requirements in 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharged activities."); 40 C.F.R. 230.6(b) (indicating that the Army Corps should "recognize the different levels of efforts that should be associated with varying degrees of impact and require or prepare commensurate documentation").  This Court finds that the Army Corps properly evaluated potential alternatives and that the Army Corps' final determination that no practicable alternative with a less adverse environmental

---

[9] As noted above, a "practicable" alternative is one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).

impact existed was not a clear error of judgment, nor arbitrary and capricious, nor contrary to law.

### i. The Army Corps' Analysis of Off-Site Alternatives

The Army Corps independently analyzed Mills/Mack-Cali's discussion of off-site alternatives, the public and agency comments received, and previously Army Corps analyses conducted in the area, and concluded "that there are no practicable offsite alternatives available for the overall redevelopment project which have less impact upon wetlands and the quality of the aquatic and human environment." MR at 36 (Lloyd Cert. Ex. 1). The Army Corps discussed the analysis of three distinct parcels referred to as the Empire Tract, Walden Swamp, and the Sisselman Tract. *Id.* at 29-30. In addition to other stated grounds, the Army Corps reasonably concluded that because each parcel that is sufficiently large to accommodate the redevelopment project consists almost entirely of regulated wetlands, and "construction on these [] sites would likely involve 50 to 100 acres of wetland fill," construction on these sites would be more damaging to the aquatic environment than the fill of 7.69 acres proposed for the Continental Airlines Arena site. *Id.* at 29-30. The Army Corps analyzed whether smaller adjacent parcels could be acquired, and determined that such alternatives are not reasonably available and are impracticable because of logistical barriers, need for additional funding, and fill of wetlands in excess of the 7.69 acres to be filled at the Continental Airlines Area site. *Id.* at 31. In addition, with respect to all off-site alternatives, the Army Corps found that they "would not achieve the overall project purpose, which is to redevelop the [Continental Airlines] Area site." *Id.* at 31.

The Army Corps' rejection of off-site alternatives was not a clear error of judgment. *See* 5 U.S.C. 706(2)(A); *Alliance for Legal Action v. U.S. Army Corps of Eng'rs*, 314 F. Supp. 2d

534, 543 (M.D.N.C. 2004); *Sierra Club*, 935 F. Supp. at 1575.  First, the Army Corps'

conclusion that the project purpose is to redevelop the Continental Airlines Arena site, a

conclusion which is not arbitrary and capricious as discussed above, indicates that the Army

Corps' rejection of off-site alternatives and decision not to conduct a more exhaustive review of

such alternatives were reasonable.  *Cf. City of Shoreacres v. Waterworth*, __ F.3d __, 2005 WL

1864251, at *4 (5th Cir. Aug. 8, 2005) (where site subject to permit is located in Harris County,

Texas, rejecting alternative sites located Galveston County, Texas in part because the proposed

alternatives did not comport with the overall project purpose, "which was to further expand

Harris County as one of the nation's major ports").  In addition, given the limited amount of fill

at issue, the Army Corps' decision not to conduct a more exhaustive off-site alternatives review

was reasonable.  *See* 40 C.F.R. 230.10; 40 C.F.R. 230.6(b); *see also Greater Yellowstone

Coalition v. Flowers*, 359 F.3d 1257, 1271 (10th Cir. 2004); *cf. Friends of the Earth v. Hintz*, 800

F.2d 822, 835 (9th Cir. 1986) (under the regulation in force, recognizing limits on the obligation

of Army Corps, which "is not a business consulting firm," to study alternatives or independently

locate alternative sites).  Moreover, Plaintiffs have not indicated how the overall project purpose

could be accomplished at any off-site alternative.  *Cf. Borough of Ridgefield v. U.S. Army Corps

of Eng'rs*, No. 89-3180, 1990 U.S. Dist. LEXIS 17054, at *38-40 (D. N.J. July 2, 1990).  Finally,

in the course of determining that there are no practicable alternative sites with less impact on

wetlands than the Continental Airlines Arena site, the Army Corps "considered the relevant

factors and articulated a rational connection between the facts found and the choice made."

*Baltimore Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983).  Accordingly, the

Court concludes that the Army Corps' conclusion as to off-site alternatives is neither arbitrary

and capricious, nor contrary to law.

### ii.  The Army Corps' Analysis of On-Site Alternatives

Plaintiffs argue that the Army Corps failed to properly consider on-site alternatives including stacking of floors of certain components of the project to reduce the overall project footprint or reconfiguration of the project, including a configuration as proposed by unsuccessful project bidders, in order to avoid filling wetland areas.  In support of their arguments, Plaintiffs allege that the Army Corps failed to apply the appropriate practicability standard set forth in the regulations, which looks to "cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).  Review of the Memorandum of Record indicates that the Army Corps reasonably considered stacking, downsizing, and alternative reconfigurations such as that proposed by rival bidder Westfield.  MR at 38-39, 46-54 (Lloyd Cert. Ex. 1).  Particularly in light of the limited scope of the fill at issue, the Army Corps' determination that no practicable alternatives existed was not arbitrary and capricious.

The Army Corps' rejection of stacking does not reflect a clear error of judgment.  In seven full single-spaced pages in the Memorandum of Record, the Army Corps addressed further stacking of the office buildings, the hotel, of the entertainment and recreation center components, including the food and home components and the fashion components, and of the parking facilities.  MR at 46-53 (Lloyd Cert. Ex. 1).  The Army Corps evaluated the information provided by Mills/Mack-Cali as well as public comments concerning stacking.  *Id.*

In its analysis, the Army Corps properly considered the factors specified in the CWA regulations.  For example, with respect to proposed stacking of office buildings, the Army Corps

analyzed constraints imposed by Federal Aviation Administration ("FAA") height limitations,[10] by permits issued by the New Jersey DEP Land Use Regulation Program[11], by avoiding interfering with radio signals emanating from a nearby radio tower, and by the overall project configuration, particularly as to the parking sites, which constraints appear to fall under the categories of logistical and technological concerns.  MR at 47-48 (Lloyd Cert. Ex. 1).  Similarly, with respect to further stacking of the hotel, the Army Corps evaluated the logistical and technological constraints imposed by FAA height limitations, and also determined that increased stacking of the hotel "would not result in avoiding any filling of the waters and wetlands of Cedar Creek" and that such stacking would "not result in any reduction in impact to the aquatic ecosystem."  *Id.* at 48-49; *see also* 40 C.F.R. § 230.10(a) (providing that "[n]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences).  With respect to further stacking of project components generally, the Army Corps concluded that additional stacking was not practicable after considering a series of logistical constraints, including "complicat[ion of] deliveries and services" and that "taller buildings would not be compatible

---

[10] The Xanadu site is located proximately to the Teterboro Commercial General Aviation Airport and is thus subject to FAA height limitations.  MR at 47 (Lloyd Cert. Ex. 1).  In the Memorandum for Record, the Army Corps noted that the height limitations of the proposed Xanadu office buildings had been approved by the FAA following an application process during which Mills/Mack-Cali was required to lower the proposed heights of several of the office buildings.  *Id.*

[11] The New Jersey DEP Land Use Regulation Program permits require the buildings to "'be compatible in scale with the design and architecture of the surrounding development.'"  MR at 47 (Lloyd Cert. Ex. 1).  The Army Corps found that the current configuration is compatible. *Id.*

with the component heights and space requirements", as well as the project's overall purpose.  *Id.*
at 49-51.  Finally, the Army Corps expressly evaluated logistical and cost implications of
alternative parking configurations, concluding that these considerations rendered the alternatives
impracticable.  *Id.* at 51-53.  Moreover, in discussing one parking alternative, the Army Corps
found that "even if all the parking were moved out of wetlands, at most only 0.8 of an acre of
wetlands or less would be avoided" and that acreage "would be fragmented and subject to further
degradation."  *Id.* at 52.  Summarizing its findings as to parking, the Army Corps stated:  "for the
reasons stated above, an alternative using further stacking of parking would not provide
inadequate [*sic.*] access for truck deliveries, would require a U-turn for access from the Turnpike
and create severe traffic congestion, and would be unreasonably costly[; and m]oving the parking
decked [sic.] structure further west would interfere with traffic circulation."  *Id.* at 53.  The Army
Corps concluded that these constraints rendered further stacking of parking impracticable.  *Id.*

      The Army Corps' analysis of downsizing as an alternative was likewise reasonable.  MR
at 53-60 (Lloyd Cert. Ex. 1).  To begin, the Army Corps stated:  "[d]ownsizing would reduce
levels, but it would not necessarily reduce footprint . . . because certain signature venues require
a certain minimum footprint at least on one level, and for the most part, these are the venues that
are necessary to create the entertainment destination sought by NJSEA."  *Id.* at 54-55.  The Army
Corps thus concluded that a downsizing alternative would not satisfy the overall project purpose.
Moreover, the Army Corps concluded that because "downsizing would not necessarily reduce the
footprint of the development", it "would not minimize wetland impacts. "  *Id.*; *see also* 40 C.F.R.
§ 230.10(a) (indicating that a "practicable alternative" must have "less adverse impact on the
aquatic ecosystem").  The Army Corps also found that downsizing would "undermine the

30

economics" of the project.  *Id.*  Finally, in rejecting a comparison to the average size of malls by

developers such as Mills/Mack-Cali, which presumably are smaller than Xanadu, the Army

Corps reasonably recognized that Xanadu is not "an 'average' Mills property" since it includes a

snow dome, a racetrack, an aquarium, and a children's education district.  *Id.*  Moreover, a

general proposition of "downsizing" as an alternative is too indefinite and undefined as to

support a finding that the Army Corps' decision was arbitrary and capricious.  *Cf. Nat'l Audobon

Society v. Hartz Mountain Development Corp.*, No. 83-1534, 14 ELR 20724 (D.N.J. Oct. 24,

1983).

     With respect to proposed shifting of project components as an alternative, the Army

Corps' analysis was likewise reasonable.  MR at 39-42 (Lloyd Cert. Ex. 1).  The Army Corps

considered several proposed reconfigurations and ultimately concluded that "the applicant's

proposed configuration, even though it requires the filing of approximately seven acres of

wetlands within the existing Continental Arena site, [] is the only practicable alternative."  *Id.* at

40.  The Army Corps rejected certain of the alternatives because they would have required filling

of more wetlands than the Xanadu project as configured, concluding that such alternatives were

"not the least environmentally damaging alternative[s], as [they] would impact more wetlands

than what is being required in the permit application."  *Id.* at 41; *see also* 40 C.F.R. § 230.10(a).

The Army Corps rejected another proposed alternative, which sought to avoid or minimize fill of

the contiguous 5.33 acre parcel referenced above, for logistical reasons, including that resultant

component shifting would create severe traffic congestion.  *Id.* at 42.

     The Army Corps reasonably concluded that moving components off-site would be

inconsistent with the project purpose, namely construction of a mixed-use commercial

31

entertainment and recreational redevelopment project.  *Id.* at 42-46.  Moreover, the Army Corps

concluded that the availability of the proposed alternative sites was at best speculative, partly

because of limitations imposed by leasehold interests held by the Jets and Giants sports

franchises and of NJSEA's specific directive that all bidders limit development to the

Continental Arena Site.  *Id.* at 46.

     With respect to configurations proposed by other bidders for the redevelopment site, the

Army Corps's conclusions were likewise reasonable.  First, the Army Corps recognized that

neither of the configurations proposed in the two rival bidders' projects were selected by the

NJSEA.  *Id* at 37-38.  As the Army Corps stated specifically in connection with its analysis of

one of the rival projects, those alternative projects were "not available and capable of being done

within the meaning of the Section 404(b)(1) of the Clean Water Act Guidelines because the

property owner, NJSEA, did not select" them.  *Id.* at 38.  Because the NJSEA rejected the rival

proposals, they are not "available and capable of being done . . . in light of overall project

purposes" and are thus not practicable.  40 C.F.R. § 230.10(a).  Furthermore, consistent with 33

C.F.R. § 320.4(j)(2)[12], the Army Corps appropriately deferred to the decisionmaking of the

---

[12] Section 320.4 contain general policies for evaluating permit applications:

The primary responsibility for determining zoning and land use matters rests with state,
local and tribal governments. The district engineer will normally accept decisions by such
governments on those matters unless there are significant issues of overriding national
importance. Such issues would include but are not necessarily limited to national security,
navigation, national economic development, water quality, preservation of special aquatic
areas, including wetlands, with significant interstate importance, and national energy
needs. Whether a factor has overriding importance will depend on the degree of impact in
an individual case.

33 C.F.R. § 320.4(j)(2)

NJSEA as well as the Meadowlands Commission in the bid selection process and Meadowlands'
land use planning and zoning.  *Id.* at 38 (noting that "in this case . . . there are not issues of
national overriding importance" requiring rejection of the NJSEA and Meadowlands
Commission with respect to zoning and land use planning).  In addition, the Army Corps
appropriately rejected one of the rival proposals as not less environmentally damaging, and thus
not practicable, because it required about the same amount of wetlands filling.  *Id.* at 37.  The
record thus "reflects that the Army Corps made the proper analysis and weighed the correct
factors in making its determination that no feasible alternatives existed."  *Hintz*, 800 F.2d at 833.

That the Army Corps made reference to "marketing advantages," "reduced
marketability," "desireab[ility]," and "synergies," or other similar concerns, MR at 44, 50, 54
(Lloyd Cert. Ex. 1), does not undermine its analysis.  First, as discussed above, the Army Corps'
analysis was reasonable and considered the proper factors.  Second, the Army Corps is required
to consider alternatives "in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).  The
Army Corps determined that the overall project purpose is, in relevant part, to redevelop the
Continental Airlines Arena site "as envisioned and authorized by the NJSEA and in conformance
with the NJSEA's strategic planning objectives."  MR at 25 (Lloyd Cert. Ex. 1).  In envisioning
the project, the NJSEA sought to "maximize the potential of the Arena site[ and] best achieve the
strategic goals of [NJSEA]."  RFP at 5 (Lloyd Cert. Ex. 2).  In addition, in the FRP the NJSEA
stated that "it is the [NJSEA]'s objective to maximize the economic potential of the [Continental
Airlines Arena] site," which objective must be balanced against other concerns including "the
business needs of the Authority's assets[] and the economic development needs of the region and
the surrounding communities."  *Id.* at 7.  Maximization of the potential, including the economic

potential, of the site is a recognizable, legitimate goal and is among the objectives in reference to which the Army Corps had to analyze potential alternatives.  *Cf. Alliance for Legal Action  v. U.S. Army Corps of Eng'rs*, 314 F.Supp. 2d 534, 549-50 (M.D.N.C. 2004); *Pamlico-Tar River Foundation v. U.S. Army Corps of Eng'rs*, 329 F. Supp. 2d 600, 613 (E.D.N.C. 2004); *Louisiana Wildlife Fed'n, Inc. v. York*, 603 F. Supp. 518, 529 (N.D. La. 1984), *aff'd in part and vacated in part on other grounds*, 761 F.2d 1044 (5th Cir. 1985).  The Army Corps' reference to factors such as "marketing advantages," "reduced marketability," "desireab[ility]," and "synergies," or other similar concerns, MR at 44, 50, 54 (Lloyd Cert. Ex. 1), was therefore reasonable.

The Army Corps properly "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Baltimore Gas & Elec. Co. v. Natural Res. Defense Counsel, Inc.*, 462 U.S. 87, 105 (1983).  In addition, the Court has not found "a clear error of judgment."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Accordingly, particularly in light of the limited scope of the fill at issue, the Army Corps' alternatives analysis was proper and its conclusion that no practicable alternatives existed was reasonable.  *See* 40 C.F.R. 230.10; 40 C.F.R. 230.6(b); *see also Greater Yellowstone Coalition*, 359 F.3d at 1271.

> ### c.   *The Army Corps' Determination Regarding Minimization of Potential Adverse Impacts Was Neither Arbitrary and Capricious Nor Contrary to Law*

Citing the same proposed alternatives discussed above, Plaintiffs argue these alternatives would minimize, if not avoid, the need to fill wetlands.  Plaintiffs conclude that "[b]ecause the Corps issued a fill permit where alternatives existed that would, at the very least, minimize impact on wetlands, the Corps permit must be vacated and remanded." (Pl. Br. at 69-70).

However, the Army Corps properly considered minimization and its conclusions were neither arbitrary and capricious nor contrary to law.

The 404(b)(1) Guidelines provide in relevant part:  ". . . no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem.  Subpart H identifies such possible steps."  40 C.F.R. § 230.10(d).  Subpart H of part 230 of 40 C.F.R. identifies examples of possible steps in the following categories:  actions concerning location of the discharge, actions concerning the material to be discharged, actions controlling the material after discharge, actions affecting the method of dispersion, actions related to technology, actions affecting plant and animal populations, actions affecting human use, and other actions.  40 C.F.R. §§ 230.70 - 230.77.  In addition, an Memorandum of Understanding between the Army Corps and the EPA explains:  "Section 230.10(d) states that appropriate and practicable steps to minimize the adverse impacts will be required through project modifications and permit conditions.  Subpart H of the Guidelines describes several (but not all) means for minimizing impacts of an activity."  Memorandum of Understanding § IIC2 (Feb. 6, 1990) (Lloyd Cert. Ex. 29).

The Army Corps properly followed the framework of Subpart H in considering the specific minimization steps to be taken here.  In the Memorandum for Record, the Army Corps listed the required steps under each of the subcategories of Subpart H, other than "Other Actions."  Such steps include, by way of example, design of "an efficient stormwater management system . . . to minimize adverse impacts to waterways"; "placement of an impervious cap over the contaminated areas which will prevent the release of contaminants"; use

of "Best Management Practices . . . including the use of silt fences or hay bales to prevent stockpiled materials from entering wetlands or open water areas on the project site"; and that "[a]s the fill material is being placed on the site, grading will take place promptly in order to reduce the risk of dispersion beyond the authorize areas o fill."  MR at 104-06.  Ultimately, in its compliance review the Army Corps concluded:  "[a]ppropriate and practicable steps have been taken to minimize potential adverse impacts of the discharge on the aquatic ecosystem (40 CFR 230 Subpart H)."  MR at 106-07, 108  (Lloyd Cert. Ex. 1).  The record thus reflects that the Army Corps considered the correct factors in making its determination concerning minimization.

While Plaintiffs argue that the Army Corps should have required a project modification in its minimization analysis, the Army Corps properly discharged its duties under the 404(b)(1) Guidelines in considering and requiring minimization consistent with the examples of steps contained in Subpart H and reasonably concluding that "appropriate and practicable steps" were taken under section 230.10(d).  The Army Corps thus "complied with its duty under the law, [] and its decision is not subject to reversal."  *Hintz*, 800 F.2d at 834.

### C.  Plaintiffs Have Failed to Establish Irreparable Harm

To prevail on a motion for preliminary injunctive relief, Plaintiffs must demonstrate by a "clear showing" that they will suffer immediate and irreparable harm if the motion is not granted. *See, e.g., Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990).  Merely establishing some risk of irreparable harm is not sufficient.  *ECRI v. McGraw-Hill, Inc*, 809 F.2d 223, 226 (3rd Cir. 1987).  Plaintiffs have failed to make the necessary showing, and, therefore, this equitable factor weighs against granting injunctive relief.

First, Plaintiffs' delay in moving for preliminary injunctive relief undermines their claim

of irreparable injury.  The permit was issued by the Army Corps on March 18, 2005.  Permit No.

2003-00549 (March 18, 2005) (Lloyd Cert. Ex. 10).  While Plaintiffs commenced this action on

March 30, 2005, they did not make the instant motion by order to show cause until May 4, 2005.

Plaintiffs participated in the administrative process throughout its evolution and could not have

been caught unaware by the issuance of the permit.  Moreover, filling at the 5.44 acre parcel

subject to the permit has been underway and, as the Court was informed during the hearing of

this matter, filling was approximately 80% complete at the time of that hearing.  Such delay,

while perhaps not of such an extensive duration to preclude the granting of preliminary

injunctive relief in and of itself, certainly deflates Plaintiffs' claim of immediate and irreparable

harm.  *See Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1092 n.27 (3d Cir. 1984) (noting that a

district court "may legitimately think it suspicious that the party who asks to preserve the status

quo through interim injunctive relief has allowed the status quo to change through unexplained

delay"); *Pharmacia Corp. v. Alcon Labs.*, 201 F. Supp. 2d 335, 384 (D.N.J. 2002) (finding that a

delay can "knock[] the bottom out of any claim of immediate and irreparable harm"); *see also*

*Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("Though such delay

may not warrant the denial of ultimate relief, it may, standing alone, . . . preclude the granting of

preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that

ordinarily accompanies a motion for preliminary relief and suggest that there is, is fact, no

irreparable injury.").

Second, while "wetlands constitute a productive and valuable public resource, the

unnecessary alteration or destruction of which should be discouraged as contrary to the public

interest", 33 C.F.R. § 320.4(b)(1); *see also* 33 U.S.C. 1251; 40 C.F.R. 230.1(d) ("The guiding

principle should be that degradation or destruction of [wetlands] may represent an irreversible

loss of valuable aquatic resources."), the Army Corps, along with the other federal and State of

New Jersey agencies that considered the potential impacts of the filling activity, concluded that

the mitigation required by the permit is sufficient to compensate for any aquatic resources that

may be impacted by the filling.  The Army Corps stated:

> The proposed activity consists of the discharge of fill material into 7.69 acres of
> wetlands and other waters of the United States.  A compensatory wetland mitigation
> plan has been provided by the applicant that includes preservation of the Empire
> Tract, and the enhancement of 15.38 of contiguous tidal wetlands at the Secaucas
> High School Site.  No significant adverse effects on the human environment are
> expected to result from the proposed issuance of the [Army] Corps permit in this
> case, and no such significant adverse effects were identified during the public interest
> review and review of the relevant environmental factors, as discussed in this
> document.  [The Army Corps] has determined that in the context of its location, the
> existing conditions at the site, the level of impacts and the measures to minimize and
> compensate for those impacts, the proposed fill would not produce a significant
> adverse effect on the human environment.

MR at 109 (Lloyd Cert Ex. 1).  After review of the administrative record, the Court concludes

that the Army Corps' determination was well within its discretion and was neither arbitrary nor

capricious.  As noted above, the 7.69 acres of wetlands subject to the permit were fragmented

from other wetlands in the area, contaminated in excess of New Jersey Department of

Environmental Protection standards, "heavily disturbed by previous human activities", and

dominated by flora having lower relative functional value as wildlife habitat.  MR at 7 (Lloyd

Cert Ex. 1).  Based on the information provided in the administrative record, the Court finds that

the Army Corps' determinations that Mills/Mack-Cali's preservation of the 587-acre Empire

Tract and enhancement of 15.38 of contiguous tidal wetlands at the Secaucas High School Site

would adequately compensate any impact from filling and that "the proposed fill would not

produce a significant adverse effect on the human environment" are not unreasonable.

In light of the foregoing, Plaintiffs have not sustained their burden of demonstrating a clear showing of irreparable harm.

### D.  The Balance of the Relative Harms Weighs Against Injunctive Relief

The third factor in the preliminary injunction analysis requires a court to consider whether "the relative harm which will be visited upon the movant by the denial of injunctive relief is greater than that which will be sustained by the party against whom relief is sought." *Atlantic City Coin & Slot Serv. Co., Inc. v. IGT*, 14 F. Supp. 2d 644, 657 (D.N.J. 1998); *see also Neo Gen Screening, Inc. v. TeleChem. Intern., Inc.*, 69 Fed. Appx. 550, 554 (3d Cir. 2003).  The Court concludes that balance of the relative harms does not favor Plaintiffs, and, therefore, this factor weighs against the imposition of a preliminary injunction.

As noted above, Plaintiffs have failed to demonstrate a clear showing of irreparable harm. Contrariwise, Defendant Mills/Mack-Cali has persuasively demonstrated that, were a preliminary injunction to be granted, it would suffer serious harm.  Mills/Mack-Cali has made an enormous financial commitment in preparing the site in accordance with the permit and, at the time of the hearing of this matter, had filled 80% of the 7.69 acres.  Moreover, Mills/Mack-Cali has demonstrated that delay in construction will negatively impact the costs associated with, the financing for, and the construction sequencing schedule for the Xanadu project.  *See* Murdock Letter at 2 (Cole Cert., Ex. 13); Juran Decl. ¶¶ 12-14; Dausch Decl. ¶¶ 3, 6-10; *see also Amoco Prod. Co. v. Village of Gambrell, AK*, 480 U.S. 531, 545 (1987); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 205 (3d Cir. 1990).  Finally, Mills/Mack-Cali represents that it has permanently and irrevocably deeded the 587-acre Empire Tract to the Meadowlands

39

Conservation Trust in accordance with the compensation plan set forth in the permit. (Mills/Mack-Cali Br. at 3).

While Mills/Mack-Cali has adequately demonstrated the threat of harm that would be posed by the granting of an injunction against it, Plaintiffs have not sufficiently supported their allegations of harm that will be suffered if the injunction does not issue.  This equitable factor, therefore, likewise weighs against injunctive relief.

### E.  The Public Interest Does Not Weigh in Favor of a Preliminary Injunction

The final equitable factor a court must consider is "the public interest in the grant or denial of the requested relief, if relevant."  *Atlantic City Coin*, 14 F. Supp. 2d at 657.  Plaintiffs note that the framework of the CWA provides that "wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest."[13]  33 C.F.R. § 320.4(b)(1); *see also* 33 U.S.C. 1251; 40 C.F.R. 230.1.  The Army Corps argues in opposition that "the public interest is not served by suspending a validly-issued [Army] Corps permit and disrupting the legitimate expectations of state agencies (NJSEA, NJDEP, and the Meadowlands Commissions) and Mills[/Mack-Cali]."  (Army Corps' Br. at 25).  Moreover, as discussed below, Mills/Mack-Cali demonstrates a public interest in permitting the development of the Xanadu project to move

---

[13] Plaintiffs cite cases in which courts have recognized that strict enforcement of the CWA furthers the public interest of "cleaning up the nation's waters and preserving the surrounding ecological environment."  *U.S. v. Malibu Beach, Inc.*, 711 F. Supp. 1301, 1313 (D.N.J. 1989); *U.S. v. Ciampitti*, 583 F. Supp. 483 (D.N.J. 1984).  These cases are inapt.  In each of the cases cited by Plaintiffs, the reviewing court first determined that the movant, in each case the U.S. Government, established a likelihood of success on the merits in that a developer was filling federal wetlands without having obtained the requisite permit.  In this matter, as discussed above, the requisite permit has been obtained and Plaintiffs have not preliminarily established that the CWA has been violated, or that it is not being strictly enforced.

forward.

Mills/Mack-Cali notes that the State of New Jersey specifically deemed the NJSEA's mandate -- which encompasses determining the location and character of projects in which holding "spectator sporting events and of trade shows and other expositions in the State" -- to be within the public interest.  N.J.S.A. 5:10-2, 5:10-5(x).  In addition, Mills/Mack-Cali submitted a series of declarations attesting to the public interest in the continued development of the Xanadu project.  Mills/Mack-Cali provided a declaration of the Treasurer of the State of New Jersey, John E. McCormac, who sits on the Board of Commissioners of NJSEA.  McCormac Decl. ¶ 2. Mr. McCormac attested to the financial benefits, through tax revenues, job creation, and indirect economic activity, of the Xanadu project to the State of New Jersey and neighboring communities.  *Id.* at ¶ 4.  Mr. McCormac also declared that a delay in the Xanadu project would jeopardize these public benefits, including "an unrecoverable loss of tax revenues."  *Id.* at ¶ 5. Mr. McCormac concluded that "the economic interests of the State would be best served by the expeditious commencement" of the Xanadu project.  *Id.* at ¶ 6.  Mills/Mack-Cali also submitted a declaration if James Minish, Senior Vice-President at the NJSEA, who is responsible for overseeing the day to day operations of Continental Airlines Arena and Giants Stadium.  Minish Decl. ¶ 1.  Mr. Minish stated that "NJSEA does not permit and public recreational use of the areas at the Arena Site that are authorized to be filled by the [Army] Corps permit", that "[t]he areas authorized to be filled by the [Army] Corps permit are largely restricted by fencing," including the "5+ acre area to the east of the Arena building." *Id.* at ¶¶ 4-5.  Mr. Minish also stated that he has never observed anyone making use of the areas to be filled for any recreational, aesthetic, or conservation purpose.  *Id.* at ¶ 6.  A declaration of Mayor James L. Cassella of East

41

Rutherford, New Jersey, wherein the Meadowlands Sports Complex is situated, was also provided.  Mayor Cassella attested to an agreement between East Rutherford and NJSEA obligating NJSEA to make payments in lieu of taxes to East Rutherford upon the commencement of certain operations at Xanadu.  Cassella Decl. at ¶¶ 3-4.  In addition to such payments, Mayor Cassella stated that the Xanadu project is expected to generate other benefits including creation of thousands of jobs and providing an "economic boost" to local businesses.  *Id.* at ¶ 6.  Finally, Bill Sheehan, founder and Executive Director of the Hackensack River Keeper organization attests to the environmental benefits of the permanent preservation of the 587-acre Empire Tract, which preservation was provided for the in redevelopment agreement between NJSEA and Mills/Mack-Cali.  Sheehan Decl. ¶ 5.   Mr. Sheehan notes that the "conveyance of the Empire Tract to the Meadowlands Conservation Trust will create a largely contiguous area of conserved wetlands in excess of 1000 acres."  *Id.* at ¶ 5.  While Plaintiffs oppose only the filling of the 7.69 acres of wetlands, and not necessarily the entire project, the 7.69 acres of wetlands are part and parcel of the entire project and a preliminary injunction against filling the 7.69 acres would impose harmful delay on the realization of benefits from the entire project.  McCormac Decl. ¶ 5; Cassella Decl. ¶ 7.  Accordingly, Mills/Mack-Cali has demonstrated a public interest in expeditious completion of the Xanadu project.

The Court is faced with competing public interests in the preservation of the 7.69 acres of wetlands and in permitting the Xanadu project's continued development so as to achieve expeditious completion.  The final factor of the preliminary injunction analysis therefore does not weigh in favor of preliminary injunctive relief.

**IV.  CONCLUSION**

For the reasons expressed above, Plaintiffs' motion for a preliminary injunction is denied.


s/ Joel A. Pisano

JOEL A. PISANO, U.S.D.J.

DATED: August 29, 2005

43