**CLOSED**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
SIERRA CLUB, NEW JERSEY PUBLIC          :
INTEREST GROUP CITIZENS                 :
LOBBY, INC., and NEW JERSEY             :
ENVIRONMENTAL FEDERATION,               :        Civil Action No. 05-1724 (JAP)
                                        :
            Plaintiffs,                 :
                                        :        **OPINION**
      v.                                :
                                        :
UNITED STATES ARMY CORPS                :
OF ENGINEERS, COLONEL RICHARD           :
J. POLO, JR., and MEADOWLAND            :
MILLS/MACK-CALI LIMITED                 :
PARTNERSHIP,                            :
                                        :
            Defendants.                 :
_____:


APPEARANCES:


Edward Lloyd (EL 2633)
Reed Super
MORNINGSIDE HEIGHTS LEGAL SERVICES, INC.
Environmental Law Clinic
Columbia University School of Law
Box E-17
435 West 116th Street
New York, NY  10027
(212) 854-4376/4291

        _Attorneys for Plaintiffs_

Michael R. Cole (MRC 9388)
Benjamin Clarke (BC 3302)
DE COTIIS, FITZPATRICK, COLE & WISLER, LLP
Glenpointe Centre West

500 Frank W. Burr Blvd.
Teaneck, NJ  07666
(201) 928-1100

Virginia S. Albrecht
Eric J. Murdock
David C. Lashway
David DePippo
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, DC  20006
(202) 995-1500
(Admitted *Pro Hac Vice*)

    *Attorneys for Defendant Meadowlands Mills/Mack-Cali Limited Partnership*

Sue Ellen Wooldridge
Assistant Attorney General
Environment and Natural Resources Division
Eileen T. McDonough (EM-0717)
Environmental Defense Section
UNITED STATES DEPARTMENT OF JUSTICE
Post Office Box 23986
Washington, D.C.  20026-3986
(202) 514-3126

Christopher J. Christie
UNITED STATES ATTORNEY
Susan Handler-Menahem (SHM 7714)
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ  07102
(973) 645-2843

    *Attorneys for Defendants United States Army Corps of Engineers and
    Colonel Richard J. Polo, Jr.*

2

PISANO, District Judge.

## INTRODUCTION

Sierra Club, New Jersey Public Interest Group Citizen Lobby, Inc., and New Jersey Environmental Federation (collectively, "Plaintiffs") filed this action against the United States Army Corps of Engineers and Colonel Richard J. Polo, Jr. (collectively, the "Army Corps") and the Meadowlands Mills/Mack-Cali Limited Partnership ("Mills/Mack-Cali"). Plaintiffs challenge a permit (the "Permit") issued by the Army Corps pursuant to section 404 of the Clean Water Act, 33 U.S.C. § 1344 (the "CWA"), and section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, authorizing Mills/Mack-Cali to fill 7.69 acres of wetlands in East Rutherford, New Jersey that are subject to the jurisdiction of the Army Corps (the "7.69 acres of wetlands" or the "Cedar Creek Wetlands").[1] In brief, Plaintiffs allege that the Army Corps's issuance of the Permit violated the CWA, the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* ("NEPA"), the Rivers and Harbors Act, 33 U.S.C. §§ 401, *et seq.*, as well as their implementing regulations. This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 2201-2202.

Plaintiffs filed the Complaint in March 2005, and, in May 2005, filed a motion for preliminary injunctive relief by order to show cause. The Court held oral argument on Plaintiffs' motion on July 6, 2005. An order denying Plaintiffs' motion for preliminary injunctive relief was entered on the Docket on July 7, 2005, and a written opinion was entered on August 29, 2005.

---

[1] The Army Corps's jurisdiction over the 7.69 acres of wetlands has not been challenged by the parties in the context of this litigation. The Court notes, however, that the Army Corps's jurisdictional determination was made prior to the Supreme Court's recent decision clarifying the ambit of the Clean Water Act and concomitantly the Army Corps's jurisdiction thereunder. *See Rapanos v. United States*, __ U.S. __, 126 S.Ct. 2208 (2006).

3

Currently before the Court are Plaintiffs' motion for summary judgment, the Army Corps's and Mill/Mack-Cali's cross-motions for summary judgment, the Army Corps's motion to strike extra-record material, and Plaintiffs' cross-motion for judicial notice.  The Court decides these motions without oral argument as it is permitted to do under Fed. R. Civ. P. 78.  For the reasons discussed below, the Court denies Plaintiffs' motion for summary judgment, grants Defendants' cross-motions for summary judgment, grants Plaintiffs' motion for judicial notice, and grants in part and denies in part the Army Corps's motion to strike.

## THE MOTIONS TO STRIKE AND FOR JUDICIAL NOTICE

Plaintiffs' motion for summary judgment included exhibits that were not part of the administrative record considered by the Army Corps during the administrative proceedings. Generally, when conducting judicial review of an agency's determination under the Administrative Procedure Act, a court is limited to the administrative record before the agency at the time the decision is made.  5 U.S.C. § 706 (providing that "the court shall review the whole record or those parts of it cited by a party"); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  The Army Corps moved to strike these extra-record documents, identified as Exhibits 18-27 to Plaintiffs' motion for summary judgment, and to limit judicial review to the administrative record submitted by the Army Corps.  Plaintiffs opposed the Army Corps's motion and cross-moved for judicial notice of documents identified as Exhibits 15-20 and 22-27 to Plaintiffs' motion for summary judgment. For the reasons discussed below, Plaintiffs' motion is granted, and the Army Corps' motion is granted in part and denied in part.

Certain of the pertinent Exhibits are not in dispute.  First, the Court notes that Plaintiffs

4

have not opposed the Army Corps's motion to the extent it seeks to strike the extra-record document identified as Exhibit 21.  Accordingly, the Army Corps's motion is granted to the extent that it seeks to strike the document identified as Exhibit 21.  Second, the Army Corps agrees that three of the documents that are the subject of Plaintiffs' motion, namely Exhibits 15, 16, and 17, may be considered by the Court even though not included in the administrative record.  Exhibit 15 is "NJSEA's Master Developer Request for Proposals."  Exhibit 16 is "NJSEA's Addendum to Master Developer Request for Proposals."  The Army Corps indicates that the documents at Exhibits 15 and 16 were cited as references in the Army Corps's documents, that record documents quote excerpts from them, and that portions of them are attached to documents listed in the index to the record; consequently, submission of Exhibits 15 and 16 serves to provide the Court with full copies of materials considered by the Army Corps. The Court agrees.  The document at Exhibit 17, "Memorandum of Agreement between the Department of the Army and the Environmental Protection Agency:  The Determination of Mitigation under the Clean Water Act Section 401(b)(1) Guidelines," was published at 55 Fed. Reg. 9210 (Mar. 12, 1990), and thus is appropriate for the Court to consider.  The documents at Exhibits 15, 16, and 17 not being subject to reasonable dispute, Plaintiffs' motion is granted to the extent that it seeks to have the Court take judicial notice of the documents identified as Exhibits 15, 16, and 17.  *See* Fed. R. Evid. 201(b).

Thus, the dispute between the parties is only as to the documents identified as Exhibits 18-20 and 22-27.  Although the general rule may be that a court is limited to the administrative record in reviewing agency action under the Administrative Procedure Act ("APA"), courts may consider evidence not contained in the record in a variety of circumstances.  *See, e.g.*, *Northcoast*

5

*Envtl. Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998) (listing instances in which a court may review materials outside the administrative record); *Bergen County v. Dole*, 620 F. Supp. 1009, 1016-17 (D.N.J. 1985) (discussing propriety of review of materials outside the administrative record).  In particular, in NEPA cases, "a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored."  *Suffolk County v. Sec'y of Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977); *see also Dole*, 620 F. Supp. at 1016-17.  Plaintiffs argue that they have submitted Exhibits 18-20 and 22-27 "in order to illustrate that the [Army Corps] neglected to mention serious environmental consequences and failed to adequately discuss reasonable alternatives to the proposed Xanadu project."  (Pltfs' Judicial Notice Br. at 6).  Thus, these documents fall under the aforementioned exception in NEPA cases to the general rule that a reviewing court is limited to considering the administrative record.

Further, Federal Rule of Evidence 201 provides, in part, that a court may take notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Each of the documents submitted at Exhibits 18-20 and 22-27 is a public or quasi-public document capable of accurate and ready determination, the authenticity of which is not at issue and the content of which is not in dispute, and is thus subject to judicial notice under Federal Rule of

Evidence 201(b).[2]  *See, e.g.*, *B.T. Produce Co., Inc. v. Robert A. Johnson Sales, Inc.*, 354 F.

Supp. 2d 284 (S.D.N.Y. 2004) (taking judicial notice of various public documents); *Del Puerto*

*Water Dist. v. U.S. Board of Reclamation*, 271 F. Supp. 2d 1224, 1233-34 (E.D. Cal. 2003)

(taking judicial notice of public and quasi-public documents in context of motion to dismiss);

*Black v. Arthur*, 18 F. Supp. 2d 1127, 1132 (D. Or. 1998) (taking judicial notice of public

document in context of motion to dismiss).

Accordingly, Plaintiffs' motion is granted, and the Army Corps' motion is granted in part

and denied in part.  The Court will consider the documents at Exhibits 18-20 and 22-27 to the

extent that they may be probative of the various arguments made by the parties as addressed

below.[3]

---

[2] Rather, the fundamental disagreement is about the inferences that Plaintiffs attempt to draw from these documents.

[3] Exhibits 18 and 19 are 10-K reports filed with the Securities and Exchange Commission by Mack-Cali Realty Corporation and Mills Corporation respectively.  Exhibit 20 is Mills Corporation's Discussion of Event Parking and Transportation Management Plan.  Exhibit 22 includes two articles, both dated November 22, 2002:  "Three Make the Cut as Arena Site Developers" published by The Star-Ledger and "Finalists Picked for Continental Arena Site; Mills Corp., Hartz Mountain, and Westfield Group Prevail" published by The Record (Bergen County, N.J.).  Exhibit 23 is a fact sheet about the New Jersey Meadowlands Commission. Exhibit 24 is a Facts and Figures sheet by the NJSEA.  Exhibit 25 is a Shopping Malls Study by the American Studies program at Eastern Connecticut State University.  Exhibit 26 is an article entitled, "Giants and Xanadu Talk Traffic While Town Gripes About Tax," dated April 28, 2005, published by the Newark Star Ledger.  Exhibit 27 is a study by the Colorado State University addressing golf course size.

## THE MOTIONS FOR SUMMARY JUDGMENT

### I.  LEGAL STANDARDS[4]

#### A.  Standard of Review Under Fed. R. Civ. P. 56(c)

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil

Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

substantive law identifies which facts are critical or "material."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue

of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then

shifts to the non-moving party to present evidence that a genuine, fact issue compels a trial.  *Id.*

at 324.  In so presenting, the non-moving party must offer specific facts that establish a genuine

issue of material fact, not just "some metaphysical doubt as to the material facts."  *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

---

[4] Certain of the arguments addressed herein were previously considered by the Court at
the preliminary injunction phase of this litigation.  Although the Court already considered
essentially the same arguments, because of the differing standards applicable to motions for
preliminary injunctive relief and for summary judgment, the Court considers any such arguments
anew in connection with the instant motions.  *See, e.g.*, *Doebler's Pa. Hybrids, Inc. v. Doebler*,
442 F.3d 812, 820 (3d Cir. 2006) (particularly in the context of a trademark case, emphasizing
the distinction between the role of the court in ruling upon preliminary injunction and summary
judgment motions); *Imaging Business Machines, LLC. v. BancTec, Inc.*, 459 F.3d 1186 (11th Cir.
2006) (addressing differing standards applicable to summary judgment and preliminary
injunction motions).  However, the relevant materials before the Court, applicable law, and the
standard of review under the Administrative Procedure Act are likewise the same on the instant
motions as on the previous motion.  In consequence, where appropriate, there are substantial
similarities between the Court's analysis herein and the Court's prior opinion in this matter.

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial.  *Anderson*, 477 U.S. at 249.  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  *Big Apple BMW v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

In general, courts have recognized that summary judgment is appropriate to adjudicate claims based on an agency's administrative record.  *See, e.g.*, *S. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102, 107 (D.D.C. 2004); *Clairton Sportsman's Club v. Pa. Turnpike Comm'n*, 882 F. Supp. 455, 463 (W.D. Pa. 1995).  This matter is substantially based on the Army Corps's administrative record, and there is no dispute as to the materials facts.  Instead, the disputes involve whether the actions of the Army Corps conform to the requirements of the applicable federal statutes and regulations.  Consequently, this matter is appropriate for summary judgment.

**B.  Standard of Review Under the Administrative Procedure Act**

Claims under the CWA and the NEPA are subject to judicial review under the APA, 5 U.S.C. §§ 701, *et seq.*  *See, e.g.*, *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 179 (3d Cir. 2000).

The APA provides in relevant part that agency actions, findings, and conclusions can be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A),(E).  This is a very narrow and highly deferential

standard under which an agency's action is presumed valid.  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *Clean Ocean Action v. York*, 861 F. Supp. 1203, 1219 (D.N.J. 1994).  A reviewing "court is not empowered to substitute its judgment for the agency's." *Citizens to Preserve Overton Park*, 401 U.S. at 416.  Instead, the court's inquiry is limited to determining whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made," *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983), and "whether there has been a clear error of judgment."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency's conclusions will be upheld "if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Passaic Valley Sewerage Comm'ns v. U.S. Dept. of Labor*, 992 F.2d 474, 480 (3d Cir. 1993); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action."). Further, agency determinations based on highly complex and technical matters are entitled to great deference.  *Baltimore Gas & Elec. Co.*, 462 U.S. at 105.  In addition, a court may take into account that the Army Corps may give deference to decisions of a state agency regarding the purpose of a project sponsored by that entity.  *See Hoosier Envtl. Council, Inc. v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953 (S.D. Ind. 2000); *see also Anthony v. Quimby*, No. 87-8250, 1990 WL 59364, at *6 (E.D. Pa. May 7, 1990).  Finally, substantial deference is given to an agency's interpretation of statutes it administers, and particularly to its own regulations, so long as the interpretation is a permissible one.  *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984); *National Wildlife Federal v. Whistler*, 17 F.3d 1341, 1344

10

(8th Cir. 1994); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

## II.  FACTUAL HISTORY

The crux of this litigation is the Army Corps's issuance of a permit pursuant to section 404 of the CWA and section 10 of the Rivers and Harbors Act authorizing Mills/Mack-Cali to fill the 7.69 acres of wetlands in connection with the construction of a project, named the Meadowlands Xanadu Redevelopment Project (the "Xanadu project"), at the Continental Airlines Arena site within the Meadowlands Sports Complex in East Rutherford, New Jersey. (US-AR003808-33 (Permit No. 2003-00549 (March 18, 2005)); US-AR003845-3992 (Army Corps Memorandum for Record on Permit Application No. 2004-00549 (March 18, 2005))).[5]

### A.  <u>The NJSEA & the Meadowlands Sports Complex</u>

The Meadowlands Sports Complex, including the site for which Xanadu is planned, is owned and managed by the New Jersey Sports and Exposition Authority ("NJSEA").  (US-AR003845).  The NJSEA's Sports Complex comprises 684 acres of the New Jersey Meadowlands.  (US-AR003849).  The Sports Complex is presently home to the Continental Airlines Arena, Giants Stadium, the Meadowlands Racetrack, and paved ancillary roadways and parking spaces.  (US-AR003852).  The Continental Airlines Arena site at issue in this litigation occupies 104 acres of the 684-acre Sports Complex.  (US-AR003849).  The Continental Airlines Arena site is comprised of the Continental Airlines Arena building, an extensive surface parking area, a peripheral roadway, and internal roadway network, and some land without construction,

---

[5] References to "US-AR", followed by a series of numbers, are to the administrative record for this matter.

including wetlands.  (US-AR003849).  About 70 acres of the site was in a developed state at the time of the Army Corps's decision.  (US-AR003849).

### B.   The Redevelopment Plan for the Continental Airlines Arena Site

During the mid-1990's, the NJSEA undertook a process to expand the Meadowlands Sports Complex entertainment product mix and to increase site utilization during the daytime. (US-AR003870-71).  As part of that process, the NJSEA determined that the redevelopment of the Continental Airlines Arena site was an appropriate project.  (US-AR003871).

In June 2002, the NJSEA issued a Request for Proposals ("RFP") soliciting plans from private companies to redevelop the 104-acre Continental Airlines Arena site, which includes the 7.69 acres of wetlands.  (*Id.*).  The RFP stated that the NJSEA envisioned "creating a multi-use destination at the Arena site that capitalizes on existing uses at the Meadowlands and expands the product mix in a manner that is complementary to those uses, without materially competing with existing business in the Meadowlands District."  (NJSEA Meadowlands Sports Complex Redevelopment of the Continental Airlines Arena Site Master Developer Request for Proposals, at 5 (June 2002)).[6]  The RFP further advised potential bidders that the NJSEA would be "receptive to concepts that incorporate reuse of the Arena," that "[a] small wetland occupies approximately eight (8) acres of the Arena site," and that interested developers should bear in mind that one of NJSEA's strategic objectives is to "[p]rotect and enhance the unique ecosystem of the Meadowlands."  (*Id.* at 5, 7, 20, 24).  While initial phases of redevelopment were to be confined to the Continental Airlines Arena site, potential bidders could submit plans incorporating later phases of development on other NJSEA-owned property at the Sports

_____

[6] Attached at Exhibit 15 to the Certification of Edward Lloyd.

Complex.  (*Id.* at 14; NJSEA Meadowlands Sports Complex Redevelopment of the Continental

Airlines Arena Site Master Developer Request for Proposals Request for Additional Information,

at 1 (October 14, 2002)[7]).

On November 21, 2002, NJSEA selected three developers as final round bidders:

Mills/Mack-Cali, Hartz Mountain Industries, Inc., and the Westfield Group.  (Matthew

Futterman, *Three Make the Cut as Arena Site Developers*, THE STAR-LEDGER, Newark, NJ (Nov.

22, 2002)[8]).  NJSEA President and CEO George Zoffinger stated that "each of these plans would

create a large number of new jobs, they each have a destination as part of their plan, and they

each actually have the potential to be built."  (*Id.*).  Only the Westfield Group's proposal

contemplated the preservation of the Cedar Creek Wetlands.  (US-AR003881).  In February

2003, the NJSEA resolved to enter into exclusive negotiations with Mills/Mack-Cali to

redevelop the Continental Airlines Arena Site pursuant to the Xanadu proposal.  (US-AR007473

(Redevelopment Agreement (Dec. 3, 2003))).

In December 2003, the NJSEA and Mills/Mack-Cali entered into a Redevelopment

Agreement, which was amended in October 2004.  (US-AR007472-7577).  The Redevelopment

Agreement delineates the uses for which Mills/Mack-Cali has the right to redevelop the

Continental Airlines Arena site.  (*Id.*).  The Redevelopment Agreement provides that certain

components of the project, including development of a hotel, office space, and minor league

baseball stadium, are contingent upon "favorable economic and market conditions."  (US-

AR007476-78).  Xanadu is a proposed $1.3 billion, 4.96 million square foot shopping, sports,

---

[7] Attached to Exhibit 16 to the Certification of Edward Lloyd.

[8] Attached to Exhibit 22 to the Certification of Edward Lloyd.

13

entertainment, hotel and office complex.  (US-AR003848).

Xanadu was subject to review under New Jersey law.  *See* N.J.S.A. 5:10-5(x).  NJSEA, the New Jersey Meadowlands Commission, the New Jersey Department of Environmental Protection, the New Jersey Department of Transportation, and the New Jersey Transportation Planning Agency each participated in some stage of a State Environmental Impact Statement review process, which included preparation of a Preliminary Draft Environmental Impact Statement ("PEIS"), circulation of the PEIS for public comment and subjecting the PEIS to public hearings, and review and submission of comments and modifications, approval by various agencies of the State of New Jersey, and ultimately the release of a Final Environmental Impact Statement in August 2004.  (US-AR009452-9646; US-AR000899-958; US-AR001800-1918).

### C. <u>Federal Permit to Fill the Cedar Creek Wetlands</u>[9]

#### 1. The Proposed Fill Areas

The Xanadu project requires filling of 7.69 acres of wetlands under the jurisdiction of the Army Corps.  The proposed fill area of 7.69 acres is comprised of ten distinct parcels:  five at the Xanadu site and five in adjacent areas where improvements to infrastructure are planned.  (US-AR003846).  The largest contiguous parcel is a 5.33 acre area East of the Continental Airlines Arena in the proposed footprint of the entertainment component of Xanadu.  ((US-AR003846; US-AR003969).  Another discrete parcel is a 1.52 acre strip along the Northern edge of the Continental Airlines Arena site.  (US-AR003846).  The remaining 0.73 acres comprises several smaller patches.  (US-AR003846).  The Army Corps described the areas to be filled as follows:

The wetlands and waterways that would be filled are 1) fragmented from major

---

[9] The legal framework for CWA fill permits is discussed *infra* at § III.B.1.a.

wetlands in the region (i.e., surrounded by existing development and roadways); 2) exhibit contamination levels above the applicable NJDEP criteria; and 3) heavily disturbed by previous human activities.

(US-AR003851).

### 2.   The Permit Application

In June 2003, Mills/Mack-Cali applied to the Army Corps for a permit to fill the 7.69 acres of wetlands in connection with development of Xanadu.[10]  (US-AR003845).  The Army Corps issued a jurisdictional determination on November 13, 2003, and, following submission of an amended permit application by Mills/Mack-Cali reflecting the Army Corps's conclusions, issued an amended jurisdictional determination on July 27, 2004.  (US-AR003849-50).  An amended permit application submitted by Mills/Mack-Cali included an alternatives analysis and a compensatory mitigation plan proposing preservation of 235 acres of wetlands on the 587-acre Empire Tract.  (US-AR003848-49).

The application was deemed complete on July 28, 2004.  (US-AR003854).

### 3.   The Public Hearing and Public Comments

On July 27, 2004, the Army Corps issued a public notice that described the permit application and announced the commencement of a public comment period on Mills/Mack-Cali's application as well as a public hearing on August 26, 2004.  (US-AR003854-55).  The comment period originally was to terminate on September 7, 2004; however, upon request by members of the public including certain of Plaintiffs, the comment period was extended first to September 14, 2004, and then to September 22, 2004.  (US-AR003854-55).  Twenty-three individual members of the public appeared at the August 26, 2004 public hearing held by the Army Corps,

---

[10] Mills/Mack-Cali amended its application in May 2004.  (US-AR003845).

six of whom made oral presentations, including representatives of Plaintiffs.  (US-AR003855;

US-AR003859).  Public comments were received from, *inter alia*, federal agencies, political

leaders, and members of the public, including Plaintiffs.  (US-AR003856-69).  The Army Corps

requested certain supplemental information from Mills/Mack-Cali, which submitted responsive

materials.[11]

### 4.  The Permit

On March 18, 2005, the Army Corps issued the Permit, which authorizes the fill of the

7.69 acres of wetlands, as well as its Memorandum for Record.  (US-AR003808-33 (Permit No.

2003-00549 (March 18, 2005)); US-AR003845-3992 (Army Corps Memorandum for Record on

Permit Application No. 2004-00549 (March 18, 2005))).  The Memorandum for Record

addresses the public comments received and contains the Army Corps's analysis mandated by the

CWA and the NEPA, including the Army Corps's "Environmental Assessment" and "Finding of

No Significant Impact."[12]  (US-AR003845-3992).  Notably, the Permit imposed as special

conditions requirements that Mills/Mack-Cali provide compensatory mitigation to offset any

impacts from the authorized filling activities.  (US-AR003809-10).  Specifically, Mills/Mack-

Cali was required to fund the enhancement of 15.38 acres of wetlands at a site referred to as the

"Secaucus[, New Jersey] High School Wetland Enhancement Site" and to preserve a site known

as the "Empire Tract," containing hundreds of acres of wetlands, by means of causing

conveyance in fee to the Meadowlands Conservation Trust.  (*Id.*).

---

[11] *See* discussion *infra* at § III.B.2.

[12] *See* discussion *infra* at § III.A.

## III.  DISCUSSION

Plaintiffs' motion for summary judgment raises the following categories of challenges to the Army Corps's issuance of the Permit:  (1) the Army Corps violated the NEPA and regulations thereunder by improperly limiting the scope of its environmental analysis and erring in its "FONSI" analysis; (2) the Army Corps violated the CWA and its regulations by failing to prohibit the destruction of wetlands where practicable alternatives exist; and (3) the Army Corps violated the CWA and its regulations by failing to provide adequate notice and opportunity for comment regarding documents upon which the Army Corps based its environmental review. Defendants' cross-motions for summary judgment argue that the Army Corps's issuance of the Permit complied with NEPA, the CWA, the Rivers and Harbors Act, as well as the implementing regulations promulgated under each.

### A.  **The National Environmental Policy Act**

Plaintiffs argue that the Army Corps violated the NEPA by improperly limiting the scope of its environmental analysis and that its issuance of a FONSI was not in accordance with law. Defendants argue that the Army Corps's NEPA analysis was proper.  Specific arguments raised by Plaintiff are addressed below.

#### 1.  **Legal Framework**

The express purposes of the NEPA are:

> To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

42 U.S.C. § 4321; *see also Twp. of Belleville v. Fed. Transit Admin.*, 30 F. Supp. 2d 782, 791

(D.N.J. 1998).  Toward that end, the NEPA requires, in relevant part, "that federal agencies assess the effects of proposed major federal actions on the human environment."  *Dunn v. United States*, 842 F.2d 1420, 1426 (3d Cir. 1988).  Under the NEPA, "it is the continuing responsibility of the Federal Government to use all practicable means [to] attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences."  42 U.S.C. § 4331(a),(b)(3).  Regulations promulgated by the Council on Environmental Quality, 40 C.F.R. 1500-08, provide guidance for the application of the NEPA, and these regulations are entitled to substantial deference.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 355-56 (1989); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 372 (1989).

By imposing "a substantive obligation upon all federal agencies to balance the environmental considerations and goals of the Congress along with the traditional factors of public interest particular to each agency's mandate," *Twp. of Belleville*, 30 F. Supp. 2d at 791 (quotations and citations omitted), the NEPA focuses "national policymaking on the interdependence between human beings and the environment," *Dunn*, 842 F.2d at 1426 (3d Cir. 1988).  The NEPA is essentially a procedural statute and does not require an agency to reach a particular result.  *Robertson*, 490 U.S. at 350-51; *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978) (stating that the NEPA's mandate is "essentially procedural . . . to insure a fully informed and well-considered decision").  Indeed, federal agencies are not required "to elevate environmental concerns over other appropriate considerations"; rather, the NEPA mandates "only that the agency take a 'hard look' at the environmental consequences before taking a major action."  *Baltimore Gas. & Elec. Co.*, 462 U.S. at 97.

18

The NEPA requires federal agencies to prepare analyses in assessing the effects of proposed agency action.  First, an agency must prepare an Environmental Assessment, which is a "concise public document" containing "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9 (2005) (Council on Environmental Quality guidelines for implementing the NEPA).  Second, after preparing that Environmental Assessment, the agency must determine whether the subject proposed action is a "major federal action[] significantly affecting the quality of the human environment."  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), 1501.4(e); 42 U.S.C. § 4332(2)(C); *see also Dunn*, 842 F.2d at 1427.  If a significant impact is found, the agency must prepare an Environmental Impact Statement.  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), 1501.4(e); *see also Dunn*, 842 F.2d at 1427.  If, however, that agency determines that the proposed action will not have a significant impact, the agency must set forth its reasons in a Finding of No Significant Impact ("FONSI").  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), 1501.4(e), 1508.13; *see also Dunn*, 842 F.2d at 1427.

Generally, the issuance of a permit under Section 404 of the Clean Water Act is considered a major federal action under the NEPA.  *See, e.g.*, *Tillamook County v. U.S. Army Corps of Eng'rs*, 288 F. 3d 1140, 1142 (9th Cir. 2002); *Stewart v. Potts*, 996 F. Supp. 668, 672 (S.D. Tex. 1998).  The Army Corps has adopted guidelines, approved by the Council on Environmental Quality, for implementing the NEPA.  *See* 33 C.F.R. Part 325, Appx. B[13]; *see also* 52 Fed. Reg. 22,518, 22,520 (June 12, 1987) (Council on Environmental Quality stating that the Army Corps's NEPA regulations are "generally within reasonable implementing agency

---

[13] Available at http://www.usace.army.mil/inet/functions/cw/cecwo/reg/33cfr325.htm.

discretion").

### 2.  The Army Corps Properly Determined the Scope of NEPA Review

Plaintiffs argue that the Army Corps violated the NEPA by limiting its Environmental Assessment to the environmental impacts of the discharge of the clean fill into the wetlands and refusing to consider both the environmental impacts of the portions of the project located on that fill as well as the upland portions of the project.  (Pltfs' Br. at 21-28).  Defendants argue that the Army Corps properly limited its review to the issue of the fill of wetlands authorized by the Permit consistent with the requirements of the NEPA and the Army Corps's implementing regulations.

In the instant matter, the specific activity requiring a Department of the Army permit is the filling of the 7.69 acres of wetlands.  *See, e.g.*, *Mo. Coal. for the Env't v. Corps of Eng'rs*, 866 F.2d 1025, 1033 (8th Cir. 1989), *overruled on other grounds*, *Goos v. ICC*, 911 F.2d 1283 (8th Cir. 1990); *Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1115-17 (9th Cir. 2000); *cf.* 53 Fed. Reg. 3120, 3121 (Feb. 3 1988).  In situations where a permit applicant proposes to conduct activity requiring a Department of the Army permit as a component of a larger project, the Army Corps's NEPA regulations direct the Army Corps District Engineer to "establish the scope of the NEPA document (*e.g.*, the E[nvironmental ]A]ssessment] or E[nvironmental ]I[mpact ]S[tatement]) to address the impacts of the specific activity requiring the D[epartment of the ]A[rmy] permit *and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review*."  *See* 33 C.F.R. pt. 325, App. B § 7.b(1) (emphasis added)); *see also* 40 C.F.R. § 1508.18 (Council on Environmental Quality implementing regulations defining a "major federal action"

triggering the NEPA to include "actions with effects that may be major and which are potentially subject to Federal control and responsibility"). The Army Corps's NEPA regulations provide guidance to determine whether there is sufficient federal control and responsibility to warrant federal review beyond the fill activity:

> The district engineer is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a federal action. Theses are cases where the environmental consequences are essentially products of the Corps permit action. Typical factors to be considered in determining whether sufficient "control and responsibility" exists include:
>
> 1. Whether or not the regulated activity compromises "merely a link" in a corridor type project (e.g. a transportation or utility transmission project).
> 2. Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.
> 3. The extent to which the entire project will be within Corps jurisdiction.
> 4. The extent of cumulative control and responsibility.

*See* 33 C.F.R. pt. 325, App. B § 7.b(2). Further, the regulations explain that "Federal control and responsibility will include the portions of the project beyond the limits of Corps jurisdiction where the cumulative Federal involvement of the Corps and other Federal agencies is sufficient to grant legal control over such additional portions of the project." *Id.* at § 7.b(2)(A). Such situations arise where "the environmental consequences of the additional portions of the projects are essentially products of Federal financing, assistance, direction, regulation, or approval." *Id.*

The determination of whether there is sufficient federal control and responsibility to expand the scope of NEPA review beyond the specific permitted activity is a matter left to the discretion of the Army Corps district engineer based on the facts and circumstances of the

individual action under review.  *See* 53 Fed. Reg. at 3122, 3127.[14]  Further, the Army Corps's

determination of the appropriate scope of its NEPA analysis, which involves the interpretation

and application of the Army Corps's NEPA regulations as well as the exercise of regulatory

discretion conferred under those regulations, is entitled to deference by a reviewing court.  *See*

*Wetlands Action Network*, 222 F.3d at 1115-17 ("The Corps' determination of the appropriate

scope of the environmental review process is entitled to deference.").

        In this case, the Army Corps "determined that there is insufficient federal control and

responsibility over the upland portions of the Project or over the entire project to expand the

scope of review for a U[nited ]S[tates ]A[rmy ]C[orps of ]E[ngineers] permit decision beyond the

limited proposed fill in wetlands and open water areas. . . ."  (US-AR003956).  As explained

below, the Court concludes that this determination reflects a proper exercise of discretion, and

the rationale for it is well-supported by the record.

        In conducting its analysis, the Army Corps reviewed the applicable regulatory framework,

including the regulations at 33 C.F.R. Part 325, Appx. B, summarized by the Court *supra*, which

---

[14] The Army Corps stated, *inter alia*:

> We have not attempted to define at what point there is sufficient Federal control or
> responsibility over the entire project to "Federalize" it for NEPA purposes.  We have
> entrusted this decision to the district commander to be based on a reasonable
> evaluation of the case-specific factual situation.  In response to comments from the
> public and governmental agencies, we have reworded this provision to state more
> clearly our intentions, and to ensure flexibility and discretion for the district commander.

53 Fed. Reg. at 3122.  Similarly, the Army Corps provided that "the district commander must
have the discretion to determine the significance of the Federal interest to justify the overall
review" because the scope of analysis may be extended beyond the impacts of the permitted
activity only "when there is a significant Federal interest, not just because of the need for an
Army permit for a minor part of the overall project."  53 Fed. Reg. at 3127.

guide the Army Corps's determination of "whether federal jurisdiction over a permitted activity of limited scope may lead to expansive NEPA review over the entire project."  (US-AR003956).  Citing 33 C.F.R. Part 325 Appx. B § 7.b, the Army Corps explained that "[u]nder USACE regulations, as a general matter, the Corps' NEPA review is limited to analyzing the impacts of the 'specific activity requiring the D[epartment of the ]A[rmy] permit, unless some exceptional circumstance justifies the expansion of the NEPA scope of analysis to cover the upland (i.e., non-jurisdictional) portions of a project."  (US-AR003957).  The "specific activity" "is the discharge of fill material into 7.69 acres of wetlands and other waters of the United States lying within the Continental Arena Site."  (US-AR003957).  The Army Corps applied the four factors set forth in 33 C.F.R. pt. 325, App. B § 7.b(2), concluding that:  "[t]he regulated activity in the instant case is not a corridor link"; while "[a]spects of an upland facility affect the proposed discharge of fill material in this case . . . , less than 8% of the project by area is under USACE jurisdiction as waters of the United States"; "beyond USACE legal jurisdiction over the waters of the United States, the Corps of Engineers has no legal control over the subject proposed project, and only minimal potential *de facto* Corps of Engineers control and responsibility over the applicant's entire project."  (US-AR003957).  Ultimately, the Army Corps determined that it would not be "appropriate, reasonable, or practicable for the Corps to try to assert such *de facto* control over the upland portions of the proposed project in this permit case."  (US-AR003957).  Applying the standards set forth in the regulations, the Army Corps concluded that "there is not sufficient federal regulatory control and responsibility over the upland portions of the project, or over the project as a whole, to warrant 'federalizing' the entire project by making it the subject of a Federal NEPA review."  (US-AR003958).  Consequently, the Army Corps determined that "it

23

would not be appropriate to expand the USACE NEPA analysis beyond the impacts of the permitted activity in the waters of the United States."  (US-AR003957).

First, Plaintiffs argue that the Army Corps erred in failing to consider the impacts of the portions of the project to be located on the permitted fill.  Specifically, Plaintiffs cite to examples contained in the Army Corps's NEPA regulations, which provide in relevant part:

> if an applicant seeks a DA permit to fill waters or wetlands on which other construction or work is proposed, the control and responsibility of the Corps, as well as its overall Federal involvement would extend to the portions of the project to be located on the permitted fill.  However, the NEPA review would be extended to the entire project, including portions outside waters of the United States, only if sufficient Federal control and responsibility over the entire project is determined to exist . . . .

33 C.F.R. pt. 325, App. B § 7.b(3).  Plaintiffs argue that the Army Corps's "control and responsibility unquestionably extends to the fill itself and 'to the portions of the project to be located on the permitted fill'" and that the Army Corps breached its duty by failing to consider the impacts of the portions of the Xanadu development to be located on the 7.69 acres of clean fill.  (Pltfs' Br. at 21-25).  Plaintiffs' argument, however, ignores both the plainly discretionary nature of a determination of the scope of NEPA analysis under the Army Corps's regulations as well as the case-specific, factor-based analysis that those regulations require.  *See Wetlands Action Network*, 222 F.3d at 1115; 33 C.F.R. pt. 325, App. B § 7.b(2).  Contrary to the Army Corps's interpretation and application of its own regulations, under Plaintiffs' interpretation a provision that is plainly set forth merely as an "example" would control the outcome in effectively all cases where a permit applicant proposes to conduct activity requiring a permit as a component of a larger project.  Such an interpretation is contrary to the plain language of the

24

regulations.  The regulations require that NEPA review "address the impacts from the specific activity requiring a D[epartment of the ]A[rmy] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review" and require "careful analysis of all facts and circumstances surrounding the relationship." *Wetlands Action Network*, 222 F.3d at 1117; *see* 33 C.F.R. Part 325, App. B § 7.b(1).  That is precisely the standard applied in this case.

Second, Plaintiffs argue that the Army Corps erred in failing to consider the environmental impacts of the upland portions of the project.  Plaintiffs argue that "the Xanadu development is located on the permitted fill and the filing [*sic.*] of these 7.69 acres of wetlands serves no purpose independent of the remaining 66% of the entertainment complex," and that, consequently, the environmental effects of the remaining portions of the project must be assessed.  (Pltfs' Br. 25-28).  In support, Plaintiffs cite to a portion of the regulations explaining that Federal involvement is sufficient to turn an essentially private action into a federal action when "the environmental consequences are essentially products of the Corps permit action."  33 C.F.R. Part 325, App. B § 7.b(2).

Plaintiffs' argument misinterprets the cited provision.  The standard set forth in the regulations cannot be reduced to a test of whether upland portions of a project have a utility independent of the permitted activity portion of the project.  *See Wetlands Action Network*, 222 F.3d at 1111-12.  Linkage "between the permitted activity and the specific project planned is the type of 'interdependence' that is found in any situation where a developer seeks to fill a wetlands as part of a large development project." *Id.* at 1116.  If that type "of connection alone were sufficient to require that an entire project falls within the purview of the Corps' jurisdiction, the

Corps would have jurisdiction over all such projects." *Id.* at 1116-17.  Rather, consistent with the Army Corps's NEPA regulations as set forth above, "[d]eciding whether federal and non-federal activity are sufficiently interrelated to constitute a single 'federal action' for NEPA purposes will generally require a careful analysis of all facts and circumstances surrounding the relationship." *Id.* at 1117 (internal quotations and citation omitted).

The Court concludes that the Army Corps's discussion of its analysis of the appropriate scope of review under NEPA demonstrates that the Army Corps properly "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co.*, 462 U.S. at 105.  Similarly, the Court has not found "a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.  Consequently, given the deference that an agency's determination of its own jurisdiction is due, the Court concludes that the Army Corps's determination regarding the scope of its NEPA review is not arbitrary and capricious, an abuse of discretion, or contrary to law.  *See Wetlands Action Network*, 222 F.3d at 1118.

### 3. The Army Corps Properly Considered Impacts, Benefits, and Alternatives

Plaintiffs argue that the Army Corps made no effort to equate the scope of its impacts analysis with the scope of its benefits or alternatives analysis.  Instead, Plaintiffs claim that, whereas the Army Corps considered the 7.69 acres of wetland fill to find no significant impact, it considered the entire Xanadu facility when discounting alternatives and weighing the benefits of the project.  (Pltfs' Br. at 30-32).  Defendants argue that the Army Corps's analysis of impacts, benefits, and alternatives under the NEPA was proper.

The Army Corps's NEPA regulations require that it include in an Environmental

26

Assessment a discussion of "reasonable alternatives" to the proposed development.  33 C.F.R. Part 325 Appx. B § 7.a.  The Army Corps must consider the following "reasonable alternatives" for the purposes of NEPA:  "issue the permit, issue with modifications or deny the permit."  33 C.F.R. Part 325, Appx. B § 7.a; *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.D.C. 1991).  Further, these regulations require that "[i]n all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal."  33 C.F.R. Part 325 Appx. B § 7.b(3).  While there may be some overlap, the reasonable alternatives analysis required by NEPA is distinct from the "practicable alternatives" analysis required under Section 404 of the CWA, which is discussed below.  *See* 40 C.F.R. § 230.10(a); *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 410 n.4 (9th Cir. 1989) (citing 33 C.F.R. § 320.4(a)).  However, the regulations provide that the NEPA Environmental Assessment should be combined with other required documents, including those prepared to comply with Section 404 of the CWA.  33 C.F.R. Part 325 Appx. B § 7.a.  The record reflects that the Army Corps properly considered each of the alternatives required by the NEPA regulations, and that the scope of alternatives analysis was consistent with the scope of its analysis for impacts and benefits.  (US-AR003901 (no action alternative)); (US-AR003959 (considering permit conditions)); (US-AR003808-11(imposing conditions)).

The instances of use of a broad scope of analysis for alternatives and benefits to which Plaintiffs cite do not evidence a violation of 33 C.F.R. Part 325 Appx. B § 7.b(3)'s requirement that the same scope be used for analyzing impacts, alternatives, and benefits.  Rather, these examples reflect the appropriate scope of analysis under the CWA.  For example, Plaintiffs note that the Army Corps held that "the scope of the Corps' review under NEPA is limited to the 7.69

acres of wetland fill" (US-AR003956), which they argue is in stark contrast to the Army Corps's statements that the Army Corps "utilized a minimum site size of 115 acres for its 2002 offsite alternatives analysis." (US-AR003877).  Similarly, Plaintiffs argue that the Army Corps "compared the social and economic benefits of the Xanadu project as a whole against the alternative of moving some project components off the Arena site." (Pltfs' Reply Br. at 7-8 (citing US-AR003887)).  However, such analyses of on-site and off-site alternatives are conducted to comply with the CWA's requirement that the Army Corps evaluate "practicable alternatives," not the NEPA regulations' requirement that the Army Corps evaluate "reasonable alternatives." *See* 40 C.F.R. § 230.10(a); *see also Sylvester*, 882 F.2d at 410 n.4 (citing 33 C.F.R. § 320.4(a)) (stating that the Army Corps's CWA regulations require it to "consider a broad range of interests that are not included under the 'reasonable alternative' analysis under the NEPA").  Further, Plaintiffs argue that the Army Corps's discussion of a "no action" alternative, which is a NEPA concept, reveals that the Army Corps's alternatives and benefits analysis considered the project as a whole, not just the 7.69 acres of fill.  (Pltfs' Reply Br. at 6-7 (citing US-AR003901)).  However, the Army Corps makes clear in its analysis that the benefits discussed in connection with evaluation of the "no action" alternative are the incremental benefits representing the difference between issuing and denying a permit, which does focus on the activity of filling the 7.69 acres of wetlands.[15]  (US-AR003901).

---

[15] The Army Corps states that, "[i]n the context of this decision memorandum, the No-Action alternative would be the USACE denying the requested permit for filling the 7.69 acres, so that the Continental Airlines Arena site is not efficiently redeveloped as proposed," and explains that "[r]edevelopment to a lesser extend [*sic.*] may be realized of the upland portions of the site." (*Id.*).  In this context, the benefits discussed by the Army Corps are thus the incremental benefits to be realized as a result of the permitting of filling activity.

_____Consequently, the Court concludes that the Army Corps properly analyzed impacts, benefits, and alternatives under the NEPA.

### 4.  The Army Corps Properly Assessed Impacts

Plaintiffs argue that the Army Corps's finding of no significant impact ("FONSI") is not in accordance with law because the Army Corps failed to analyze the potential environmental effects of the Xanadu project.  (Pltfs' Br. at 31-34).

A plaintiff "is obligated to demonstrate specifically how and why . . . finding of 'no significant impact' was somehow erroneous or unreasonable."  *Lower Alloways Creek v. Pub. Serv. Elec. & Gas Co.*, 687 F.2d 732, 746-47 (3d Cir. 1982); *see also Citizens Advisory Comm. on Private Prisons, Inc. v. U.S. Dep't of Justice*, 197 F. Supp. 2d 226, 241 (W.D. Pa. 2001); *Twp. of Belleville*, 30 F. Supp. 2d at 801-02.  Plaintiffs argue that "[t]he potential environmental effects of the Xanadu retail and entertainment complex are unknown because the Corps has not fulfilled its duty to analyze them[; h]owever, the size and character of the Xanadu development suggest that the environmental impacts will be vast."[16]  (Pltfs' Br. at 32)  Further, Plaintiffs argue that the Army Corps's "decision not to prepare an environmental impact statement rested

---

[16] In opposition to Plaintiffs' motion and in support of its cross-motion for summary judgment, Mills/Mack-Cali argues that, although not required to do so, the Army Corps took a "hard look" at the potential impacts from the Xanadu project as a whole.  (Mills/Mack-Cali Br. at 23-24).  While the Court notes that the Army Corps's Memorandum for Record states that the Army Corps "has also investigated and considered the potential effects of the Applicant's project on a broader scale, beyond the Corps' NEPA scope of analysis" (US-AR 003959; *see also* US-AR003903-39), in light of the disposition of this claim as discussed above, the Court need not reach the issue of whether the Army Corps's analysis of the impacts of the entire project was adequate.

entirely on the agency's illegal limitation of the scope of the environmental assessment"[17] and

that, had the Army Corps considered the environmental impacts of the entire project, the Army

Corps "undoubtedly would have concluded that an environmental impact statement was

necessary."  (Pltfs' Br. at 34).  In addition, Plaintiffs argue that the length of the environmental

assessment document belies the finding of no significant impact.  (Pltfs' Br. at 33).  Such

unsupported, conclusory allegations fail to demonstrate how and why the Army Corps's finding

of no significant impact was unreasonable or erroneous, and are not adequate to support

overturning the Army Corps's finding of no significant impact.  *See, e.g.*, *Pres. Endangered*

*Areas of Cobb's History Inc. v. U.S. Army Corps of Eng'rs*, 916 F. Supp. 1557, 1565 (N.D. Ga

1995) (rejecting conclusory arguments as insufficient to show that the Army Corps's FONSI was

arbitrary and capricious).

The only arguments Plaintiffs make with any specificity are that the FONSI contradicts

the North Jersey Transportation Planning Authority, Inc.'s ("NJTPA")[18] finding of regional

significance and that the Army Corps failed to consider long-term effects of the permit.

However, neither argument is supported by the record.

Plaintiffs' argument that the FONSI was in conflict with the NJTPA's finding that the

Xanadu project is a regionally significant project is premised on a conflating of the Clean Air

Act's (the "CAA") transportation conformity requirements and its general conformity

---

[17] As discussed above, the Army Corps's scope of the environmental assessment was not
contrary to law, an abuse of discretion, or arbitrary and capricious.

[18] The Memorandum for Record refers to the NJTPA as the metropolitan planning
organization responsible for determining air quality conformity throughout the region, which
description has not been challenged.  (US-AR003931).

requirements, and the conclusion of this argument lacks record support.

First, the phrase "regionally significant" has different meanings when qualifying the term "project" under the CAA's transportation conformity requirements and when qualifying the term "action" under the CAA's general conformity requirements.[19]  The NJTPA determination at issue was its classification of the Xanadu project as a "regionally significant non-federally funded project" pursuant to its annual transportation conformity analysis.  Under the transportation conformity rules,

> "[r]egionally significant project means a transportation project (other than an exempt project) that is on a facility which serves regional transportation needs (such as . . . major planned developments such as new retail malls, sports complexes, etc., . . . ) and would normally be included in the modeling of a metropolitan area's transportation network, including at a minimum all principal arterial highways and all fixed guideway transit facilities that offer an alternative to regional highway travel."

---

[19] The CAA establishes a joint state and federal program to control air pollution.  *See* 42 U.S.C. § 7401, *et seq*.  In relevant part, the CAA contemplates that measures necessary to attain primary and secondary national ambient air quality standards for certain pollutants will be applied to individual sources through an implementation plan prepared by each state, subject to EPA review and approval, for each air quality control region within the state.  42 U.S.C. § 7410.  Under the general conformity requirements, the CAA provides that no federal agency shall "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title."  42 U.S.C. § 7506(c)(1).  "Conformity" is defined as follows:

> Conformity to an implementation plan means– **(A)** conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and **(B)** that such activities will not– **(I)** cause or contribute to any new violation of any standard in any area; **(ii)** increase the frequency or severity of any existing violation of any standard in any area; or **(iii)** delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

42 U.S.C. § 7506(c)(1).

40 C.F.R. § 93.101; 40 C.F.R. § 93.100.  Conversely, under the general conformity rules, a

"[r]egionally significant action means a Federal action for which the direct and indirect emissions

of any pollutant represent 10 percent or more of a nonattainment or maintenance area's emission

inventory for that pollutant."  40 C.F.R. § 93.152; *see also* 40 C.F.R. § 93.152.  Thus, contrary to

Plaintiffs' argument, the NJTPA's classification of the Xanadu project as a "regionally

significant non-federally funded project" pursuant to its annual transportation conformity

analysis does not reflect a determination of the anticipated emissions resulting from the project.

Consequently, Plaintiffs' argument that the FONSI was in conflict with the NJTPA's finding that

the Xanadu project is a regionally significant project lacks either merit or evidentiary support.

Likewise, Plaintiffs' argument that the Army Corps violated NEPA and the implementing

regulations by refusing to examine long-term effects in contravention of a mandate that it

consider "[b]oth short- and long-term effects" of the permit is contradicted by the record.  (Pltfs'

Br. 28-30 (citing 40 C.F.R. § 1508.27(a))).  Specifically, Plaintiffs point to a statement in the

Memorandum for Record that "[p]otential indirect impact from filling of the 6.42 acres of

common reed dominated wetlands may include increased nutrient and sediment loads to the

Hackensack River system during construction" (US-AR003905), and argue that this evidences

that the Army Corps ignored its duty to conduct a long term assessment of the impacts on air

quality pursuant to the Clean Air Act.

The record belies Plaintiffs' arguments.  First, Plaintiffs rely on a single reference to the

potential impact of water runoff "during construction" to support the allegation that the Army

Corps improperly limited the temporal scope of its analysis to consideration of only short-term

effects.  The particular discussion Plaintiffs reference does address potential short-term effects of

water runoff.  However, elsewhere the Memorandum for Record analyzes the long-term effects of water runoff.  (US-AR003920-23).  Thus, this reference to construction impacts does not support a conclusion that the Army Corps considered only short term impacts.  Rather, in connection with the analysis of long-term effects of water runoff, it shows that the Army Corps properly considered both short-term and long-term effects.

Second, the record reflects that the Army Corps likewise conducted an assessment of both long-term and short-term impacts on air quality.  (US-AR003930-33).  In the Memorandum for Record, the Army Corps discusses short-term impacts on air quality, such as those that may result from emissions from construction vehicles.  (US-AR003930-32).  However, the Army Corps also considered that "[t]he Meadowlands Xanadu Redevelopment Project will contribute to regional air emissions in the region from mobile sources."  (US-AR003931).  Based on air emissions data submitted by the applicant, the Army Corps determined that "the activities proposed under this permit will not exceed de minimis levels of direct emissions of a criteria pollutant or its precursors and are exempted under 40 CFR 93.153."  (*Id.*).  Further, the Army Corps cited analysis by NJTPA in determining that "the Xanadu Project will not have a significant indirect or cumulative effect on air quality" in the region.  (*Id.*).  Ultimately, the Army Corps concluded that "[e]mission and impact analyses completed for the Project show that both mobile sources and stationary sources during project operation, as well as the construction emissions relevant to federal activities, will all be in compliance with NAAQS or Federal Conformity Rules."  (US-AR003932).

Consequently, the Court concludes that Plaintiffs have failed to demonstrate that there is any factual support in the record for Plaintiffs' claims that the Army Corps improperly limited

33

the temporal scope of its analysis to only short-term effects, that the FONSI conflicts with a

finding of the NJTPA, or that the FONSI otherwise was not in accordance with law.

### 5.  Conclusion

For the reasons addressed above, Plaintiffs' motion for summary judgment on their

claims asserted under the NEPA is denied, and Defendants' cross-motions for summary

judgment on Plaintiffs' NEPA claims are granted.

### B.  **The Clean Water Act**

Plaintiffs argue that the Army Corps violated the Clean Water Act and its regulations by

(1) failing to prohibit the destruction of wetlands where a practicable alternative exists and (2)

committing prejudicial procedural error by relying on documents submitted by Mills/Mack-Cali

after the close of the public comment period without reopening the public comment period.

Defendants argue that the Army Corps's CWA analysis was in accordance with law and that the

Army Corps complied with procedural requirements.  The specific arguments raised by Plaintiffs

are addressed below.

### 1.  **The Army Corps's Alternatives Analysis Was Neither Arbitrary and Capricious nor Contrary to Law**

#### a.  *Regulatory Framework*

The CWA establishes a regulatory regime designed to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To achieve this

goal, the CWA prohibits discharge of any pollutant, including dredged or fill material, into

navigable waters, which include certain wetlands,[20] unless authorized by a CWA permit issued

---

[20] "Navigable waters" are "waters of the United States," which includes certain wetlands
as outlined in regulations promulgated under the CWA.  33 U.S.C. § 1362(7); 33 C.F.R. § 328.3;

by the Army Corps.  33 U.S.C. § 1311(a).

Section 404 of the CWA authorizes the Army Corps to "issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).  CWA regulations establish a case-by-case review process for the issuance of individual permits that involves site-specific documentation and review, opportunity for public hearing, public interest review, and a formal determination.  *See* 33 C.F.R. Pts. 323, 325.  The public interest review for an individual permit requires that the Army Corps balance "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments."  33 C.F.R. § 320.4(a)(1).  A permit will not be granted if contrary to the public interest.  *Id.*

A CWA section 404 permit must satisfy regulations promulgated both by the Army Corps and by the Environmental Protection Agency (the "EPA").  *Hintz*, 800 F.2d at 831.  The regulations promulgated by the EPA under section 404(b)(1) of the CWA (the "404(b)(1) Guidelines," codified at 40 C.F.R. Pt. 230),[21] provide that "[n]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."[22]  40 C.F.R. § 230.10(a); *see also*

---

*see also* 40 C.F.R. § 230.3; *Rapanos v. United States*, __ U.S. __, 126 S.Ct. 2208 (2006).

[21] Regulations implementing the CWA promulgated by the Army Corps incorporate the 404(b)(1) Guidelines promulgated by the EPA, including by requiring the Army Corps's permitting decision to include an assessment of whether the activity conforms with the 404(b)(1) Guidelines.  *See* 33 C.F.R. § 320.4(b)(4); 33 C.F.R. § 325.2(a)(6).

[22] An "aquatic ecosystem" means "waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and

33 C.F.R. § 320.4(a)(2)(ii) (indicating that the Army Corps' public interest analysis must take into account practicable alternative locations and methods for accomplishing the project's objective).  A "practicable" alternative is one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).  The 404(b)(1) Guidelines establish a presumption that all practicable alternatives that do not involve a discharge into wetlands have less adverse impact on the environment "unless clearly demonstrated otherwise."  *Id.*; 40 C.F.R. §§ 230.2(q-1), 230.41.

To determine whether a practicable alternative exists, the Army Corps undertakes a multi-step sequential analysis.  40 C.F.R. § 230.5.  In relevant part, the Army Corps first determines whether the project is water-dependent.  *Id.*; 40 C.F.R. § 230.10(a)(3).  The 404(b)(1) Guidelines establish a presumption that practicable alternatives are available for projects that are not water-dependent "unless clearly demonstrated otherwise."  40 C.F.R. § 230.10(a)(3).  A water-dependent project is one that "requires access or proximity to or siting within the special aquatic site[, which includes wetlands,] in question to fulfill its basic purpose."  40 C.F.R. § 230.10(a)(3).  If the Army Corps determines that the project is not water-dependent, it then must presume that practicable alternatives not involving wetlands exist.  40 C.F.R. §§ 230.10(a)(3), 230.5.  A permit will not be granted unless the presumption is rebutted by a clear contrary demonstration by the applicant.  40 C.F.R. §§ 230.10(a)(3), 230.5.

The 404(b)(1) Guidelines also provide that, where no practicable alternative sites exist that would avoid filling or have a less adverse impact on wetlands, the next step in the analysis is to consider whether "appropriate and practicable steps have been taken which will minimize

_____

animals."  40 C.F.R. § 230.3(c).

potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d); *see also Fund for Animals, Inc.* v. *Rice*, 85 F.3d 535, 544 (11th Cir. 1996) (indicating that where "filling of wetlands cannot be avoided, the 'appropriate and practicable steps' must be taken to minimize the potential adverse impacts of the discharge on wetlands").

Finally, the Army Corps can reduce potential adverse impacts associated with a discharge by requiring mitigation as a condition[23] of a permit. 33 C.F.R. § 325.4(a)(3); *see also* 33 C.F.R. § 210.4(r)(1). Resource losses are to "be avoided to the extent practicable." 33 C.F.R. § 320.4(r)(1). "Consideration of mitigation will occur throughout the permit application review process and includes avoiding, minimizing, rectifying, reducing, or compensating for resource losses."[24] *Id.* Mitigation to be accomplished through compensation "may occur on-site or at an off-site location." *Id.*

### b. The Army Corps Properly Defined the Overall Project Purpose

As they argued in their motion for preliminary injunctive relief, Plaintiffs argue that the Army Corps improperly defined the basic project purpose overly narrowly, thereby rendering its entire alternatives analysis legally deficient. (Pltfs' Br. at 38). Defendants argue that the project purpose definition was proper.

In the Memorandum for Record, the Army Corps articulated the overall project purpose

---

[23] The Army Corps "will add special conditions to Department of the Army permits when such conditions are necessary to satisfy legal requirements or to otherwise satisfy the public interest requirement." 33 C.F.R. § 325.4(a)(3).

[24] "Mitigation" may include "[a]voiding the impact altogether by not taking a certain action or parts of an action"; [r]ectifying the impact by repairing, rehabilitating, or restoring the affected environment"; and [c]ompensating for the impact by replacing or providing substitute resources or environments." 40 C.F.R. § 1508.20.

as follows:

> The overall project purpose is to redevelop the Continental Airlines Arena site (allowing for continued use of the Arena Building), as envisioned and authorized by the NJSEA and in conformance with the NJSEA's strategic planning objectives. The overall project involves construction of a mixed-use commercial Entertainment/Recreation Center development emphasizing sports, recreation, and entertainment facilities, including a minor league baseball stadium, office buildings, a hotel, retail space, restaurants, required parking, and improvements to the transportation network at and near the Meadowlands Sports Complex.

(US-AR003869). Further, the Army Corps indicated that the definition of overall project purpose "is based on the RFP process and reflects, in general, the needs of the State of New Jersey as represented by the [NJSEA] and the Meadowlands Commission and as defined for implementation under the Redevelopment Agreement." (*Id.*)

Plaintiffs argue that the purportedly overly narrow project purpose definition improperly limits the Army Corps's ability to consider off-site alternatives. Specifically, Plaintiffs allege that "[t]he first sentence of the Corps' purpose definition is legally deficient because it is limited to the redevelopment of the Arena Site and therefore precludes any consideration of offsite alternatives; [and] the second sentence is legally deficient because the Corps substitutes a project description for basic project purpose." (Pltfs' Br. at 39). Further, Plaintiffs argue that the Army Corps committed legal error by defining the project purpose more narrowly than the NJSEA had done in the RFP and by ignoring the fact that the Redevelopment Agreement does not obligate Mills/Mack-Cali to construct significant components of the project that are included in the definition of overall project purpose. (*Id.* at 40). In addition, Plaintiffs argue that on-site practicable alternatives to filling the 7.69 acres of wetlands exist because Mills/Mack-Cali is not obligated to construct such project components. (*Id.* at 44).

38

Because the 404(b)(1) Guidelines define a "practicable alternative" as an alternative that "is available and capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes*," 40 C.F.R. § 230.10(a)(2) (emphasis added), the overall project purpose must be identified by the Army Corps as a predicate to the Army Corps's alternatives analysis.  *See Nw. Envt'l Def. Ctr. v. Wood*, 947 F. Supp. 1371, 1377 (D. Or. 1996).  The Army Corps is not restricted to the definition of project purpose contained in a permit application.  Rather, the Army Corps is "required independently to review and define the project's overall purpose," *Alameda Water & Sanitation Dist. v. Reilly*, 930 F. Supp. 486, 492 (D. Colo. 1996), and to ensure that the applicant's stated purpose is legitimate, *Hintz*, 800 F.2d at 833-34.  However, the Army Corps "has a duty to take into account the objectives of the applicant's project.  Indeed, it would be bizarre if the [Army] Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." *Louisiana Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985); *see also Sylvester*, 882 F.2d at 409 (same).  Nonetheless, "an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable." *Sylvester*, 882 F.2d at 409.

The definition's focus on the Continental Airlines Arena site is consistent with both case law and Army Corps guidance.  While Plaintiffs contend that the Army Corps's limitation of the project purpose to redevelopment of the Continental Airlines Arena site constitutes reversible error because it precludes consideration of off-site alternatives, courts have upheld location-specific overall project purpose definitions where the specific site was essential to the project purpose.  In *Sylvester v. U.S. Army Corps of Engineers*, a project purpose definition that

39

restricted construction of a golf course to the site of an alpine destination resort was upheld, even though it limited consideration of off-site alternatives not contiguous to the rest of the resort complex because they "'did not meet [the applicant's] basic purpose and need.'"  882 F.2d at 409.  *Sylvester* stated that "in determining whether an alternative site is practicable, the [Army] Corps is not entitled to reject [the applicant]'s genuine and legitimate conclusion that the type of golf course it wishes to construct is economically advantageous to its resort development."  *Id.* (quoting the administrative record).  Likewise, *Stewart v. Potts* found that "the City [of Lake Jackson]'s purpose of providing a local, affordable golf course would be thwarted if the golf course could not be constructed within the City's extraterritorial jurisdiction."  996 F. Supp. at 675-76.  Accordingly, *Stewart* found that the Army Corps had discretion "to consider alternatives only within the City of Lake Jackson's extraterritorial jurisdiction."  *Id.*  Similarly, *Northwest Environmental Defense Center v. Wood* determined that a project purpose to "'develop a large semiconductor fabrication plant in the Eugene[, Oregon] area'" was neither arbitrary nor capricious in light of "substantial evidence" in the administrative record regarding the applicant's "legitimate economic reasons for choosing to construct its project in Eugene." 947 F. Supp. at 1377 (quoting administrative record).  In addition, Army Corps guidance further supports the reasonableness of Army Corps's site-specific approach under circumstances where the site is essential to the project's purpose:  "[s]ome projects may be so site-specific . . . that no offsite alternative could be practicable.  In such cases the alternatives analysis may appropriately be limited to onsite options only."  U.S. Army Corps of Engineers, *Regulatory Guidance Letter 93-02:  Guidance on Flexibility of the 404(b)(1) Guidelines and Mitigation Banking*, § 3(a)(ii) (Aug.

23, 1993).[25]  The Army Corps's decision to restrict the project purpose to "the Continental Airlines Arena site" is thus not contrary to law.

In addition, the site-specific project purpose definition is well-supported by the administrative record.  As noted, the Army Corps may give deference to decisions of a state agency regarding the purpose of a project sponsored by that entity.  *Hoosier Envtl. Council, Inc.*, 105 F. Supp. 2d 953.  In the Memorandum for Record, the Army Corps recognized that the NJSEA selected the site and the redevelopment nature of the project (US-AR003871), and that "[b]y definition, the only types of projects responsive to th[e NJSEA's] initiative were those proposed to develop new, related, and complementary uses on the [Continental Airlines] Arena site, not somewhere else in northern New Jersey."  (US-AR003879).  Moreover, the Army Corps noted that each of the bidders' proposals to the NJSEA "affirmed that redevelopment of the Arena site was an essential aspect of their respective project purposes."  (US-AR003871).  As to Mills/Mack-Cali in particular, the Army Corps considered that Mills/Mack-Cali, "as a bidder in this public process, needed to propose a project to redevelop the [Continental Airlines] Arena site"; otherwise Mills/Mack-Cali would have been disqualified as a bidder.  (*Id.*).  The record also reflects that both the Fish and Wildlife Service and the Meadowlands Commission viewed the project purpose as redevelopment of the Continental Arena Airlines site.  (US-AR003863; US-AR003872).  Ultimately the Army Corps concluded that "redevelopment is an entirely legitimate aspect of this project, which is well-documented throughout the NJSEA's long planning and development history for this site and which requires the introduction of 'new, related and complementary uses to the Arena site.'"  (US-AR003871).  Regardless, in responding

_____

[25] Available at http://www.sac.usace.army.mil/permits/93-02.html.

to a challenge to the project purpose in the Memorandum for Record, the Army Corps noted that the "stated overall project purpose has not precluded an analysis of either off-site or onsite alternatives," and proceeded to explain that "[t]he applicant has evaluated adjacent properties which might potentially allow opportunities for redevelopment of the Arena site, but each of these sites was either too small to accommodate the overall project elements or resulted in far greater impacts to wetlands." (US-AR003870). Thus, the Army Corps's approval of the site-specific project purpose is supported by the record, and the Court cannot conclude that it was arbitrary and capricious.

The second sentence of the Xanadu project purpose definition is likewise proper. Plaintiffs contend that the project purpose is "legally deficient" because it "substitutes a project description for basic project purpose" and because it defines the project purpose more narrowly than the NJSEA had done in the RFP. However, as noted above, the Army Corps has a duty to consider the applicant's purpose.[26]  *See, e.g.*, *Sylvester*, 882 F.2d at 409; *Stewart*, 996 F. Supp. 675-76. The Army Corps indicated that the overall project purpose was "to redevelop the Continental Airlines Arena site . . . *as envisioned and authorized by the NJSEA*." (US-AR003869 (emphasis added)). Further, the Army Corps indicated that the definition of overall project purpose "is based on the RFP *process* and reflects, in general, the needs of the State of New Jersey as represented by the [NJSEA] and the Meadowlands Commission *and as defined for implementation under the Redevelopment Agreement*." (US-AR003869 (emphasis added)).

---

[26] The Redevelopment Agreement embodies the final decision of the NJSEA as to the approved key components for the redevelopment of the site and, as such approval is a prerequisite to any development by Mills/Mack-Cali, also represents Mills/Mack-Cali's project purpose.

Accordingly, in defining the project purpose, the Army Corps relied on the RFP, the RFP

process, and the Redevelopment Agreement.  Plaintiffs' argument that the Army Corps erred by

not limiting the definition of project purpose to the RFP ignores the fact that the RFP was only an

initial step in the NJSEA's decision-making, which also included review of various private-

sector proposals and culminated in the Redevelopment Agreement.  Moreover, the Army Corps

recognized that "[i]n selecting the applicant, NJSEA has approved each of the components set

forth in the applicant's proposed project" and that "NJSEA has considered and endorsed the key

elements of the overall project."  (US-AR003872).  Mills/Mack-Cali's objective necessarily must

include what is authorized in the Redevelopment Agreement, and the Army Corps's deference to

the determination of NJSEA regarding project components was not inappropriate.  *See Hoosier*

*Envtl. Council*, 105 F. Supp. 2d 953; *Sylvester*, 882 F.2d at 409.

    In addition, Plaintiffs argue that the Army Corps's project purpose definition caused it to

reject on-site practicable alternatives to filling the 7.69 acres of wetlands because Mills/Mack-

Cali is not obligated to construct such project components.  (Pltfs' Br. at 44).  The Army Corps

did not commit legal error or act arbitrarily and capriciously by including in the project purpose

definition components of the project that the Redevelopment Agreement does not obligate

Mills/Mack-Cali to construct.  The record indicates that the Army Corps properly took into

account that the elements listed were essential elements of the project, specifically stating that the

overall project purpose contained the "key project elements."  (US-AR003871-72); *cf. Shoreline*

*Assocs. v. March*, 555 F. Supp. 169, 179 (D. Md. 1983), *aff'd*, 725 F.2d 677 (4th Cir. 1984)

(stating that Army Corps must differentiate between project components that are integral to and

merely incidental to a project's basic purpose).  In addition, the overall project purpose definition

43

is in accordance with CWA regulations requiring "[a]ll activities which the applicant plans to undertake which are reasonably related to the same project and for which a D[epartment of the ]A[rmy] permit would be required [to] be included in the same permit application."  33 C.F.R.§ 325.1(d).[27]  In fact, in considering a comment made during the permitting process regarding the impacts of project components that are market-dependent and that are scheduled to be phased-in, the Army Corps recognized its obligation under 33 C.F.R.§ 325.1(d) to consider Mills/Mack-Cali's plans to undertake activities reasonably related to the project.  (US-AR003900-01).  Accordingly, the Army Corps's incorporation in the overall project purpose definition of the components of the project as identified and approved in the Redevelopment Agreement is neither contrary to law nor arbitrary and capricious.

While a project's purpose may not be defined in an overly narrow manner so as to artificially constrain the Army Corps's alternatives analysis, *Whistler*, 17 F.3d at 1344, the definition of project purpose at issue does not raise these concerns.  In addition, under the circumstances present in this action, that the Army Corps included project components listed in the Redevelopment Agreement in the overall project purpose was not improper.  The Army Corps's conclusion that the "overall project purpose definition is reasonable, reflecting the needs

---

[27] Section 325.1(d) states:

> All activities which the applicant plans to undertake which are reasonably related to the same project and for which a DA permit would be required should be included in the same permit application.  District engineers should reject, as incomplete, any permit application which fails to comply with this requirement.  For example, a permit application for a marina will include dredging required for access as well as any fill associated with construction of the marina.

33 C.F.R.§ 325.1(d).

of the State and this unique redevelopment property," is neither arbitrary and capricious, nor contrary to law.  *See* 5 U.S.C. § 706(2)(a); *Whistler*, 27 F.3d at 1346.

### c.   The Army Corps Properly Considered the Factors in Section 404(b)(1) in Analyzing Alternatives

Plaintiffs argue that the Army Corps committed legal error in rejecting on-site alternatives based on factors explicitly prohibited by the implementing regulations.  Defendants argue that the Army Corps's alternatives analysis was proper.

Section 404(b)(1) provides that "[a]n alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).  Plaintiffs argue that, in analyzing stacking, downsizing, and reconfiguration alternatives, the Army Corps considered whether such proposed alternatives would be less marketable, convenient, desirable, or synergistic.  Plaintiff further argues that the Army Corps thus applied an improper practicability standard and committed legal error.

Particularly in light of the limited scope of the fill at issue, the Army Corps's determination that no practicable alternatives existed was not arbitrary and capricious.  In its analysis, the Army Corps properly considered the factors specified in the CWA regulations.

The Army Corps's analysis of stacking alternatives was reasonable.[28]  With respect to proposed stacking of office buildings, the Army Corps analyzed logistical and technological concerns, including constraints imposed by Federal Aviation Administration ("FAA") height

---

[28] Certain elements of the Xanadu project will be stacked.  For example, different districts within the fashion and retail zone will be stacked between two and four levels high and associated parking will also be stacked.  (US-AR003893-95).

limitations,[29] by permits issued by the New Jersey DEP Land Use Regulation Program,[30] by

avoiding interfering with radio signals emanating from a nearby radio tower, and by the overall

project configuration, particularly as to the parking sites.  (US-AR003891-92).  Similarly, with

respect to further stacking of the hotel, the Army Corps evaluated the logistical and technological

constraints imposed by FAA height limitations, and also determined that increased stacking of

the hotel "would not result in avoiding any filling of the waters and wetlands of Cedar Creek"

and that such stacking would "not result in any reduction in impact to the aquatic ecosystem."

(US-AR003892-93); *see also* 40 C.F.R. § 230.10(a) (providing that "[n]o discharge of dredged or

fill material shall be permitted if there is a practicable alternative to the proposed discharge

which would have less adverse impact on the aquatic ecosystem, so long as the alternative does

not have other significant adverse environmental consequences).  With respect to further stacking

of project components generally, the Army Corps concluded that additional stacking was not

practicable after considering a series of logistical constraints, including "complicat[ion of]

deliveries and services" and that "taller buildings would not be compatible with the component

heights and space requirements," as well as the project's overall purpose.  (US-AR003893-95).

Finally, the Army Corps expressly evaluated logistical and cost implications of alternative

---

[29] The Xanadu site is located proximately to the Teterboro Commercial General Aviation Airport and is thus subject to FAA height limitations.  (US-AR003891).  In the Memorandum for Record, the Army Corps noted that the height limitations of the proposed Xanadu office buildings had been approved by the FAA following an application process during which Mills/Mack-Cali was required to lower the proposed heights of several of the office buildings.  (*Id.*).

[30] The New Jersey DEP Land Use Regulation Program permits require the buildings to "'be compatible in scale with the design and architecture of the surrounding development.'" (US-AR003891).  The Army Corps found that the current configuration is compatible.  (*Id.*).

parking configurations, concluding that these considerations rendered the alternatives impracticable.  (US-AR003895-97).  Moreover, in discussing one parking alternative, the Army Corps found that "even if all the parking were moved out of wetlands, at most only 0.8 of an acre of wetlands or less would be avoided" and that acreage "would be fragmented and subject to further degradation."  (US-AR003896).  Summarizing its findings as to parking, the Army Corps stated:  "for the reasons stated above, an alternative using further stacking of parking would not provide inadequate [*sic.*] access for truck deliveries, would require a U-turn for access from the Turnpike and create severe traffic congestion, and would be unreasonably costly[; and m]oving the parking decked [*sic.*] structure further west would interfere with traffic circulation."  (US-AR003897).  The Army Corps concluded that these constraints rendered further stacking of parking impracticable.  (*Id.*).

The Army Corps' analysis of downsizing as an alternative was likewise reasonable.  (US-AR003897-US-AR003904).  To begin, the Army Corps stated:  "[d]ownsizing would reduce levels, but it would not necessarily reduce footprint . . . because certain signature venues require a certain minimum footprint at least on one level, and for the most part, these are the venues that are necessary to create the entertainment destination sought by NJSEA."  (US-AR003898-99).  The Army Corps thus concluded that a downsizing alternative would not satisfy the overall project purpose.  Moreover, the Army Corps concluded that because "downsizing would not necessarily reduce the footprint of the development," it "would not minimize wetland impacts."  (*Id.*); *see also* 40 C.F.R. § 230.10(a) (indicating that a "practicable alternative" must have "less adverse impact on the aquatic ecosystem").  The Army Corps also found that downsizing would "undermine the economics" of the project.  (US-AR003898-99).  Finally, in rejecting a

47

comparison to the average size of malls by developers such as Mills/Mack-Cali, which presumably are smaller than the Xanadu project,[31] the Army Corps reasonably recognized that Xanadu is not "an 'average' Mills property" since it includes a snow dome, a racetrack, an aquarium, and a children's education district.  (*Id.*).  Moreover, a general proposition of "downsizing" as an alternative is too indefinite and undefined to support a finding that the Army Corps's decision was arbitrary and capricious.  *Cf. Nat'l Audobon Soc'y v. Hartz Mountain Dev. Corp.*, No. 83-1534, 14 ELR 20724 (D.N.J. Oct. 24, 1983).

With respect to proposed shifting of project components as an alternative, the Army Corps's analysis was likewise reasonable.  (US-AR003883-86).  The Army Corps considered several proposed reconfigurations and ultimately concluded that "the applicant's proposed configuration, even though it requires the filling of approximately seven acres of wetlands within the existing Continental Arena site, [] is the only practicable alternative."  (US-AR003884).  The Army Corps rejected certain of the alternatives because they would have required filling of more wetlands than the Xanadu project as configured, concluding that such alternatives were "not the least environmentally damaging alternative[s], as [they] would impact more wetlands than what is being required in the permit application."  (US-AR003885); *see also* 40 C.F.R. § 230.10(a).  The Army Corps rejected another proposed alternative, which sought to avoid or minimize fill of the contiguous 5.33 acre parcel referenced above, for logistical reasons, including that resultant component shifting would create severe traffic congestion.  (US-AR003886).

---

[31] Plaintiffs have submitted materials indicating that the Xanadu project will be the largest shopping mall in New Jersey and the 15th largest shopping mall in the United States, as well as being significantly larger than the average Mills Corporation shopping mall.  *See* Exhibits 19 and 25 to the Certification of Edward Lloyd.

Further, with respect to alternatives contemplating construction on other NJSEA-owned lands, the Army Corps reasonably concluded that moving components off-site would be inconsistent with the project purpose comprising construction of a mixed-use commercial entertainment and recreational redevelopment project. (US-AR003886-90). Moreover, the Army Corps reasonably concluded that the availability of the proposed alternative sites was at best speculative, partly because of limitations imposed by leasehold interests held by the Jets and Giants sports franchises and of NJSEA's specific directive that all bidders limit development to the Continental Arena Site. (US-AR003890).

That the Army Corps made reference to "marketing advantages," "reduced marketability," "desireab[ility]," and "synergies," or other similar concerns (US-AR003888, US-AR003894, US-AR003898), does not undermine its analysis. First, as discussed above, the Army Corps's analysis was reasonable and considered the proper factors. Second, the Army Corps is required to consider alternatives "in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). The Army Corps determined that the overall project purpose is, in relevant part, to redevelop the Continental Airlines Arena site "as envisioned and authorized by the NJSEA and in conformance with the NJSEA's strategic planning objectives." (US-AR0038869). In envisioning the project, the NJSEA sought, *inter alia*, to "maximize the potential of the Arena site[ and] best achieve the strategic goals of [NJSEA]." (NJSEA Meadowlands Sports Complex Redevelopment of the Continental Airlines Arena Site Master Developer Request for Proposals, at 5 (June 2002)).[32] In addition, the NJSEA stated in the FRP that "it is the [NJSEA]'s objective to maximize the economic potential of the [Continental Airlines Arena] site," which objective

---

[32] Attached at Exhibit 15 to the Certification of Edward Lloyd.

must be balanced against other concerns including "the business needs of the Authority's assets[]

and the economic development needs of the region and the surrounding communities."  (*Id.* at 7).

Maximization of the potential, including the economic potential, of the site is a recognizable,

legitimate goal and is among the objectives in reference to which the Army Corps had to analyze

potential alternatives.  *Cf. Alliance for Legal Action v. U.S. Army Corps of Eng'rs*, 314 F. Supp.

2d 534, 549-50 (M.D.N.C. 2004); *Pamlico-Tar River Foundation v. U.S. Army Corps of Eng'rs*,

329 F. Supp. 2d 600, 613 (E.D.N.C. 2004); *York*, 603 F. Supp. at 529 (N.D. La. 1984), *aff'd in

part and vacated in part on other grounds*, 761 F.2d 1044 (5th Cir. 1985).  The Army Corps's

referencing of factors such as "marketing advantages," "reduced marketability," "desireab[ility],"

and "synergies," or other similar concerns (US-AR003888, US-AR003894, US-AR003898), was

therefore reasonable.

The Army Corps properly "considered the relevant factors and articulated a rational

connection between the facts found and the choice made."  *Baltimore Gas & Elec. Co.*, 462 U.S.

at 105.  In addition, the Court has not found "a clear error of judgment."  *Motor Vehicle Mfrs.

Ass'n of U.S., Inc.*, 463 U.S. at 43.

Accordingly, particularly in light of the limited scope of the fill at issue, the Court

concludes that the record "reflects that the Army Corps made the proper analysis and weighed the

correct factors in making its determination that no feasible alternatives existed."  *Hintz*, 800 F.2d

at 833.

### d.   *The Army Corps Properly Considered the Alternative Represented by the Westfield Proposal*

Plaintiffs argue that the Westfield proposal demonstrates that a practicable alternative

exists to avoid the destruction of wetlands while still meeting the project purpose and, that, consequently, the Army Corps's failure to consider it as evidence that the project purpose could be met without filling wetlands was error.  Defendants argue that the Army Corps's alternatives analysis was proper.

Specifically, Plaintiffs argue that the Westfield proposal, which did not contemplate filling the 7.69 acres of wetlands, was "available and capable of being done . . . in light of overall project purposes."  40 C.F.R. § 230.10(a).  Plaintiffs make clear that they do not assert that Westfield should have been selected to redevelop the site, but instead that their argument is that the Westfield proposal demonstrates that a practicable alternative that did not require filling of wetlands existed.

The Court concludes that the Army Corps's conclusions were neither arbitrary and capricious nor contrary to law.  First, as recognized by the Army Corps, although Westfield was one of the three finalists selected by NJSEA and the Westfield proposal would have required zero wetlands filling, NJSEA ultimately rejected the Westfield proposal because it did not meet NJSEA's strategic planning objectives, used the Arena building which is not available, did not enhance sports or entertainment offerings, and did not thoroughly address traffic movements.  (US-AR003880-81).  Indeed, the Army Corps recognized that neither of the configurations proposed by the two rival bidders, Westfield and Hartz, were selected by the NJSEA.  (US-AR003881-82).  Consistent with 33 C.F.R. § 320.4(j)(2),[33] the Army Corps appropriately

---

[33] Section 320.4 contain general policies for evaluating permit applications:

The primary responsibility for determining zoning and land use matters rests with state, local and tribal governments.  The district engineer will normally accept decisions by such governments on those matters unless there are significant issues

deferred to the decisionmaking of the NJSEA as well as the Meadowlands Commission in the bid

selection process and Meadowlands land use planning and zoning.  (US-AR003882) (noting that

"in this case . . . there are not issues of national overriding importance" requiring rejection of the

NJSEA and Meadowlands Commission with respect to zoning and land use planning).  Because

the NJSEA rejected the alternative proposals made by Westfield and Hartz, they are not

"available and capable of being done . . . in light of overall project purposes," and are thus not

practicable.  40 C.F.R. §§ 230.3(q), 230.10(a).

Second, as discussed above, the Army Corps is required to consider alternatives "in light

of overall project purposes."  40 C.F.R. § 230.10(a)(2).  Plaintiffs' argument that the Army Corps

erred in failing to consider the Westfield proposal as a practicable alternative fails to accord due

consideration to the overall project purpose.  The overall project purpose comprises redeveloping

the Continental Airlines Arena site "as envisioned and authorized by the NJSEA and in

conformance with the NJSEA's strategic planning objectives," "allowing for continued use of the

Arena Building," and "construction of a mixed-use commercial Entertainment/Recreation Center

development emphasizing sports, recreation, and entertainment facilities."  (US-AR0038869).

The Army Corps recognized that the Westfield proposal had been rejected in relevant part

because it did not meet NJSEA's strategic planning objectives, used the Arena building which is

---

of overriding national importance.  Such issues would include but are not
necessarily limited to national security, navigation, national economic
development, water quality, preservation of special aquatic areas, including
wetlands, with significant interstate importance, and national energy needs.
Whether a factor has overriding importance will depend on the degree of impact
in an individual case.

33 C.F.R. § 320.4(j)(2).

not available, and did not enhance sports or entertainment offerings.  (US-AR003881).  Each of those conclusions is inconsistent with the overall project purpose.  The Army Corps's analysis of the alternative represented by the Westfield proposal reflects appropriate consideration of an alternative "in light of overall project purposes."

Accordingly, the Army Corps's alternatives analysis and its conclusion that no practicable alternatives existed were neither arbitrary and capricious nor contrary to law.  *See* 40 C.F.R. § 230.10; 40 C.F.R. § 230.6(b); *see also Greater Yellowstone Coal.*, 359 F.3d at 1271.

### e.  Conclusion

For the reasons addressed above, Plaintiffs' motion for summary judgment on their substantive claims asserted under the CWA is denied, and Defendants' cross-motions for summary judgment on Plaintiffs' substantive CWA claims are granted.

### 2.  The Army Corps Did Not Commit Prejudicial Procedural Error

Plaintiffs argue that the Army Corps violated the CWA and the regulations promulgated thereunder by failing to provide adequate notice and opportunity for comment regarding pivotal data upon which the Army Corps based its environmental review.  (Compl. 126-30; Pltfs' Br. at 62-74).  Defendants argue that the Army Corps correctly complied with procedural requirements and that, in any event, Plaintiffs were not prejudiced by any lack of opportunity to comment on documents at issue.

### a.  Legal Framework

Section 404 of the CWA states that the Army Corps may issue a permit "after notice and opportunity for public hearings."  33 U.S.C. § 1344(a).  The Army Corps must publish notice soliciting public comment within fifteen days after determining that a permit application is

complete.  33 C.F.R. § 325.2(a)(2); 33 U.S.C. § 1344(a).  The Army Corps's implementing regulations provide that "public notice is the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impact on the public interest."  *Id.* § 325.3(a).  Further, the regulations state that "[t]he notice must . . . include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment."  *Id.* The regulations indicate information to be incorporated into the notice, including in relevant part "[a]ny other available information which may assist interested parties in evaluating the likely impact of the proposed activity, if any, on factors affecting the public interest."  *Id.* § 325.3(a)(13).

The district engineer "will issue a supplemental, revised, or corrected public notice if in his view there is a change in the application data that would affect the public's review of the proposal."  *Id.* § 325.2(a)(2).  Further, "[t]he district engineer will also evaluate the application to determine the need for a public hearing."  *Id.* § 325.2(a)(5), 327.

The district engineer considers the comments received when acting on the permit application.  *Id.* § 325.2(a)(3).  Substantive comments are furnished to the permit applicant, which is allowed an opportunity to submit any further views it may wish to offer.  *Id.*  The district engineer is authorized to request the views of the applicant on particular issues if the district engineer determines that he or she must have the applicant's views in order to make a public interest determination.  *Id.*

### b.  *The Army Corps Did Not Commit Prejudicial Procedural Error*

Plaintiffs allege that the Army Corps's determination was based on pivotal data and

analysis received by the Army Corps after the Xanadu permit application was deemed complete

on July 28, 2004 and after the public comment period closed on September 22, 2004.  (Pltfs' Br.

at 62-63 (citing US-AR003854-55).  Specifically, the particular documents submitted after the

close of the public comment period that are challenged by Plaintiffs are:  a "Meadowlands

Regional Transportation Analysis" prepared for the Meadowlands Regional Transportation

Analysis prepared for the NJSEA and the New Jersey Department of Transportation (US-

AR003539-3572); a Clean Air Act "General Conformity Determination" (US-AR001632-42);

and an "Air Quality Conformity Determination of the 2004 Amended Regional Transportation

Plan and the FY 2005-2007 Transportation Improvement Program" by the NJTPA (US-

AR001643-70).  Plaintiffs note that these documents are referenced in the Memorandum for

Record.  (US-AR003931; US-AR003938).  Plaintiffs submit that these documents were not made

available for public comment, and, consequently, the Army Corps violated its duty to provide

notice and opportunity for public hearings and comment.

Pursuant to the process summarized above, following the receipt of comments, the Army

Corps requested that Mills/Mack-Cali respond to adverse comments received, the issues raised at

the August 26, 2004 public hearing held by the Army Corps, and sections of a State Hearing

Officers' Report relevant to the permit application.  (US-AR001674-76).  In relevant part, the

Army Corps specifically requested information on "[t]raffic and [a]ir quality, including site-

specific emissions data, as requested in our August 26, 2004 letter."  (US-AR001675).

Thereafter, Mills/Mack-Cali submitted the documents challenged by Plaintiffs.  The

Army Corps relied on the Meadowlands Regional Transportation Analysis in finding that "no

significant indirect or cumulative adverse impacts to traffic are anticipated as a result of this

project." (US-AR003939).  The Army Corps relied on the data in the General Conformity

Determination in deciding that a CAA conformity determination was not required because the air

emissions from the permitted activity, the filling of the 7.69 acres of wetlands, "will not exceed

*de minimis* levels of direct emissions of a criteria pollutant or its precursors and are exempted by

40 C.F.R. § 93.153."  (US-AR003931).  The Army Corps relied on the NJTPA's Air Quality

Conformity Determination in finding that the Xanadu project "will not have a significant indirect

or cumulative effect on air quality."  (*Id.*).

The Court concludes that the Army Corps's decision not to open a supplemental notice

and comment period following the submission of the aforementioned documents by Mills/Mack-

Cali was not contrary to law, arbitrary and capricious, or an abuse of discretion.

As an initial matter, nothing in the CWA or the implementing regulations requires that

the Army Corps allow an opportunity for the public to comment on an applicant's response to the

original public comments.  *See, e.g.*, *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 545 (11th Cir.

1996) (recognizing Army Corps's discretion in determining whether to issue supplemental public

notice and upholding permitting decision where Army Corps had not reopened comment period

after applicant added a 2.5 mile access road to project that required filling additional wetlands

after the close of comment period); *Wood*, 947 F. Supp. at 1381 (upholding Army Corps's

permitting decision where Army Corps had received information from applicant after comment

period but did not offer a supplemental notice and comment period); *Sierra Club v. U.S. Army

Corps of Eng'rs*, 935 F. Supp. 1556, 1581 (S.D. Ala. 1996) ("While the plaintiffs are correct that

no supplemental public notice was issued by the Corps . . . they ignore the fact that no such

notice is required under the relevant CWA regulations.").  Otherwise, the comment period could

continue in a never-ending circle.  *Cf. Rybachek v. U.S. E.P.A.*, 904 F.2d 1276, 1286 (9th Cir. 1990) (rejecting mandatory supplemental comment period in the context of agency rulemaking).

Instead, as indicated above, the Army Corps's regulations relegate the decision whether to provide supplemental notice and opportunity for comment to the discretion of the district engineer "if in his view there is a change in the application data that would affect the public's review of the proposal."  33 C.F.R. § 325.2(a)(2); *see also B&B P'ship v. United States*, No. 96-2025, 1997 WL 787145, at *6-7 (4th Cir. Dec. 24, 1997) (finding no abuse of discretion where district engineer did not issue supplemental notice and comment for materials submitted by applicant after comment period).  The record does not indicate that the documents complained of rose to the level of "a change in the application data that would affect the public's review of the proposal."  33 C.F.R. § 325.2(a)(2).  Two of the supplemental documents were issued by State entities at the conclusion of state proceedings based on those entities' particular areas of expertise and authority, on which the Army Corps is entitled to rely.  The report submitted by Mills/Mack-Cali reflects only additional information, not any appreciable change in data that could have affected the public's review of the permit application.  Given that the public was well apprised by the initial notice of traffic and air quality issues to which the challenged supplemental materials pertain, as evidenced by comments to the initial notice received by the Army Corps,[34] the Army Corps's decision not to reopen the comment period was reasonable and does not reflect an abuse of discretion.

Further, in this case, the Army Corps stated in its public notice that it expected to issue a

_____

[34] *See* US-AR003858-59; US-AR003932-33; US-AR013842-857; US-AR001706-755; US-AR001972-2428.

FONSI for the proposed fill activity (US-AR000750); advised the public in the public notice that

it would rely in part on supplemental information submitted by the applicant (US-AR000749);

held a public hearing; accepted extensive written comments from members of the public,

including from Plaintiffs, on issues including those addressed in the challenged supplemental

documents; extended the public comment; issued the Memorandum for Record, which includes

an Environmental Assessment and a FONSI; and never changed course regarding any issue

relevant to Plaintiffs' challenge.  In light of the foregoing, the Court cannot conclude either that

the Plaintiffs' right to meaningful public participation was violated, or that Army Corps's

decision was arbitrary and capricious.

  Finally, even if the Army Corps's decision not to reopen the comment period amounted to

procedural error, Plaintiffs have failed to demonstrate that the absence of an opportunity to

comment on the challenged documents resulted in any prejudice that could be cured by a remand.

*See* 5 U.S.C. § 706 (stating that in judicial review of agency action, "due account shall be taken

of the rule of prejudicial error"); *Sierra Club v. Slater*, 120 F.3d 623, 637 (6th Cir. 1997) (stating

that the rule of prejudicial error provides that "a mistake that has no bearing on the ultimate

decision or causes no prejudice shall not be the basis for reversing an agency's determination").

Plaintiffs have failed to provide any reasonably specific indication of how they would have

commented on these studies if they had had the opportunity to do so or how any such comments

would have influenced the Army Corps's decision to issue the Permit to fill the 7.69 acres of

wetlands.  *See Slater*, 129 F.3d at 637; *Save Our Heritage, Inc. v. FCC*, 269 F.3d 49, 61-62 (1st

Cir. 2001) ("Agency missteps too may be disregarded where it is clear that a remand 'would

accomplish nothing beyond further expense and delay.'"); *Chem. Mfrs. Assoc. v. EPA*, 870 F.2d

177, 202 (5th Cir. 1989), *clarified by* 885 F.2d 253 (1989) (stating that a plaintiff must "indicate with 'reasonable specificity' what portions of the document[s] it objects to and how it might have responded if given the opportunity").

Consequently, the Court concludes that the Army Corps's decision not to open a supplemental comment period was not arbitrary and capricious, an abuse of discretion, or contrary to law.

### *c. Conclusion*

For the reasons addressed above, Plaintiffs' motion for summary judgment on their procedural claims asserted under the CWA is denied, and Defendants' cross-motions for summary judgment on Plaintiffs' procedural CWA claims are granted.

### C.  The Rivers and Harbors Act

_____  Plaintiffs' final remaining claim alleges a violation of Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403 and 33 C.F.R. § 320.4(a).  Defendants have moved for summary judgment on this claim.  Plaintiffs do not appear either to have moved for summary judgment on their Rivers and Harbors Act claim or to have opposed Defendants' motion on this claim.

In circumstances where a party fails to oppose a motion for summary judgment, Federal Rule of Civil Procedure 56(e) provides that the court may grant the moving party's motion for summary judgment "if appropriate."  *See, e.g.*, *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990); *see also Damiano v. Sony Music Entertainment, Inc.*, 975 F. Supp. 623, 627 (D.N.J. 1996) (granting summary judgment because the court considered the motion unopposed where plaintiff failed to establish *prima facie* case); *United States v. Rohm & Haas*

59

*Co.*, 939 F. Supp. 1157, 1161 (D.N.J. 1996) (same).  A moving party's motion is appropriately granted when that party is entitled to judgment as a matter of law.  *Anchorage Assocs.*, 922 F.2d at 175.

Plaintiffs' Rivers and Harbors Act claim alleges that the Army Corps failed to properly conduct a public interest review pursuant to Section 10 of the Rivers and Harbors Act.  However, the record reflects that the Army Corps reasonably conducted its public interest review (US-AR003902-41, 003961-62), and Plaintiffs have failed to make any showing to the contrary.  No violation of the Rivers and Harbors Act having been established and no genuine issue of material fact having been raised, Defendants are entitled to entry of summary judgment against Plaintiffs on this claim.  *See, e.g.*, *Anchorage Assocs.*, 922 F.2d at 175; *Damiano*, 975 F. Supp. at 627; *Rohm & Haas Co.*, 939 F. Supp. at 1161.

Accordingly, Defendants' motion for summary judgement on Plaintiffs' Rivers and Harbors Act claim is granted.

## CONCLUSION

For the reasons expressed above, (1) Plaintiffs' motion for summary judgment is denied; (2) the Army Corps's cross-motion for summary judgment is granted; (3) Mills/Mack-Cali's cross-motion for summary judgment is granted; (4) the Army Corps's motion to strike is granted in part and denied in part; and (5) Plaintiffs' cross-motion for judicial notice is granted. Consequently, this case is closed.  An appropriate order accompanies this opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

DATED:  September 28, 2006

60